SECURITY LIFE INSURANCE COMPANY *v*. LEEPER.

Opinion delivered May 10, 1926.

1. INSURANCE—REINSTATEMENT OF POLICY—ENLARGEMENT OF CONDITIONS.—In a suit upon a reinstated policy of life insurance, which contained a stipulation allowing reinstatement as a matter of right upon compliance with certain requirements, the insurer has no right to enlarge the terms upon which the reinstatement can be obtained.

2. INSURANCE—ENLARGEMENT OF CONDITIONS OF REINSTATEMENT.— Where a life insurance policy gave an absolute right of reinstatement upon terms which did not include a new contract with reference to a forfeiture in case of suicide, the insurer had no right to impose that additional feature upon the assured in procuring a reinstatement.

3. RELEASE—FRAUD—EVIDENCE.—Evidence *held* to establish that there was no fraud in the procurement of a release.

4. CONTRACTS—MISTAKE OF LAW.—A mistake of law, in the absence of fraud or undue influence, does not afford ground for the abrogation or reformation of a contract.

5. INSURANCE—SETTLEMENT OF CLAIM—MISTAKE.—Settlement of a claim under a life insurance policy on the advice of persons relied on by beneficiary in accepting as true statement by insurer's representative that there was no liability thereunder, *held* not void for mutual mistake of law, of which insurer's representative had superior knowledge.

Appeal from Chicot Circuit Court; *Turner Butler,* Judge; reversed.

*Arthur S. Lytton, O. C. Burnside,* and *W. G. Streett,* for appellant.

*John Baxter* and *R. W. Wilson,* for appellee.

McCULLOCH, C. J.   This is an action instituted by appellee on a life insurance policy in the sum of $5,000 to recover an unpaid balance, alleged to be justly due, there having already been paid a part of the sum named in the policy.   Appellant defended on the ground that there was no liability at all on account of violation of a clause in the policy against suicide within one year, and defended also on the ground that there had been a settlement of the disputed claim, and that appellant had executed a release in consideration of the sum agreed upon.

The policy in question was issued on July 10, 1919, on the life of James E. Leeper, in the sum of $5,000, payable to his wife, the appellee, Julia Edna Leeper.   There was a provision in the policy that, in the event the assured committed suicide within one year from date thereof, the amount payable should be limited to the sum of one annual premium. There was also a provision in the policy for a reinstatement in case of lapse or forfeiture for nonpayment of premiums.   There was a forfeiture or lapse on March 10, 1921, by reason of failure to pay a premium, but on March 15, 1921, application for reinstatement was made in accordance with the terms of the policy, and a reinstatement was granted.   The application reaffirmed the statements of the original policy, and recited an agreement that "in the event of self-destruction, whether sane or insane, within one year from the date of approval by the company of this application for reinstatement, the amount payable as a death benefit under said policy shall be equal to two annual premiums on said policy, and no more."

James E. Leeper committed suicide on November 1, 1921, at the town of Dermott, Arkansas, where he and his wife, the appellee, resided, and a few days thereafter appellee made proof of the death to the company.

On November 13, 1921, Mr. C. V. Hicks of Chicago, who is a lawyer by profession and a member of appellant's legal staff, went to Dermott for the purpose of adjusting the claim with appellee. He remained there two days, and an agreement was finally entered into between appellee and Hicks, acting for appellant, whereby the latter paid the sum of $2,500 in full settlement of appellee's claim under the policy. A written release was signed by appellee, reciting the terms of the policy and agreeing to accept the sum named in full settlement.

James E. Leeper had borrowed from appellant $200, and on the trial of the cause the jury returned a verdict in favor of appellee for the sum of $2,300, being the amount of the policy after deducting the sum of $2,500, already paid, and the $200 loan.

The first contention of appellant is that there is no liability under the policy because of violation of the stipulation against suicide within one year, the contention being that the stipulation in the application was controlling, and that the period ran from the date of the approval of the application. We are of the opinion, however, that the point made by counsel is concluded by the decision of this court in the case of *New York Life Insurance Co.* v. *Adams,* 151 Ark. 123. That case, the same as the present one, was a suit on a reinstated policy which contained a stipulation allowing reinstatement as a matter of right upon compliance with certain requirements, and we decided that the company "had no right to enlarge the terms upon which reinstatement could be obtained." In that case the original policy contained no warranty of the truth of the answers of the assured, and this court decided that the company had no power to require a stipulation in the application for reinstatement that the answers and statements of the assured should be treated as warranties. The only provision in the policy now before us with respect to suicide related to the period running from the date of the original policy, and, since the policy gave an absolute right of reinstatement upon

terms which did not include a new contract with reference to suicide, appellant had no right to impose that additional feature upon the assured in procuring reinstatement. The trial court was correct therefore in holding that the company was originally liable under the policy, notwithstanding the stipulation in the application.

Appellee seeks to escape the effect of her settlement of the claim and her release executed to appellant on three grounds, namely: (1). That Hicks, the agent of appellant, perpetrated a fraud on her by misrepresenting the state of the law with reference to the effect of the suicide clause set forth in the application for reinstatement; (2) that the settlement was made under a mutual mistake of the parties as to the law with reference to the effect of the suicide clause; and (3), that she was mentally incapable of entering into a contract of settlement at the time the release was signed. These questions were submitted to the jury, and the verdict was, as before stated, in favor of appellee.

There is very little, if any, dispute as to the material facts concerning the execution of the release by appellee and the attendant circumstances. James E. Leeper was the postmaster at Dermott, and, four days after his death, appellee was appointed postmistress, and she was acting in that capacity until after this settlement was made with appellant. Appellee gave her personal attention to the management of the postoffice, and worked from seven o'clock in the morning until seven o'clock in the evening. She had several clerks or assistants in the office. When Hicks arrived in Dermott on November 14, 1921, he called upon appellee at the postoffice, and discussed with her the question of liability under the policy, and showed her the suicide clause set forth in the application for reinstatement. He asserted to her at that time that the company was not liable for more than two premiums on account of the violation of the suicide clause, and he adhered to that assertion throughout subsequent negotiations. There were several interviews between Hicks and appellee, and at the second one, which was late in the

afternoon of the second day of Hicks' visit to Dermott, he made appellee an offer to pay $1,000 in full settlement, which offer appellee declined. The settlement was made that night, at a meeting at the office of a bank in Dermott, at which meeting there were present, in addition to Hicks and appellee, a Mr. Franklin, the cashier of the bank, who was appellant's local agent, and a Mr. Helmstetter, and Judge Hammock, the chancellor of that district, both of the latter being personal friends of appellee, and they attended the meeting as her friends and advisers. This meeting had been previously arranged. In the discussion there Hicks renewed the claim that the policy had been forfeited, and that there was no liability on account of the breach of the suicide clause. Hicks also renewed his offer of $1,000, which was again declined, and thereupon Helmstetter requested Hicks to leave the room for a while so as to permit a conference between the others present. Franklin was, as before stated, local agent of appellant, but did not attend the meeting in that capacity, and had no authority from the company to make a settlement or to participate therein. After a conference between those who remained in the room, lasting twenty or thirty minutes, Hicks was recalled and was asked to increase his offer of settlement to $2,500, it being urged upon him by those present that it would be good business policy, even if there was no liability, as the company was doing a considerable amount of business in that locality. Hicks accepted the offer, after some hesitancy, and after being assured by Judge Hammock that, if the company found fault with him in making the settlement for that sum, they would volunteer to defend his course in the matter. The settlement was then closed at this meeting, the release was signed, and the money was paid over to appellee. It is not contended that there was any misrepresentation made by Hicks as to any facts concerning the contents of the policy or any other fact, but that there was merely a misstatement of the law concerning the legal effect of the stipulation in the application for reinstatement. It

seems clear to us that there is not the slightest evidence of any fraud involved in the statement concerning the legal effect of this stipulation. The Adams case, *supra,* was decided by this court on December 19, 1921, more than a month after this settlement was made, therefore the question of law involved was, at least, an open one in this State at the time of the settlement. There was no representation as to any particular decision of this court or of any other court, but merely a claim on the part of Hicks that the stipulation in the application was legally controlling. There is nothing to show that this contention was not made in perfectly good faith, for the law on the point was unsettled until the subsequent decision of this court. It must be remembered, too, that the parties were dealing at arm's length, and appellee had her friends and advisers present, and had no right to rely upon the statement of appellant as to the law applicable to the case. She and her advisers had the same opportunities as Hicks did to ascertain the state of the law on the subject. The record is entirely devoid of any act of fraud or any fraudulent intent on the part of Hicks, and that feature of the case may readily be eliminated.

Nor do we think that the evidence is legally sufficient to show lack of mental capacity on the part of appellee at the time she made the settlement. It is true that some of the witnesses, including witness Franklin, testified that appellee was laboring under intense mental strain on account of the tragic death of her husband— that she was a mental wreck, as some of them stated. These statements were, however, mere conclusions of a relative degree of lack of mental capacity, for the undisputed evidence shows that appellee was a woman of intelligence and business capacity. She was engaged in business for herself at the time of the death of her husband, and she immediately took charge of the postoffice and operated it and was attending to the affairs of the postoffice during both of the days when her interviews with Hicks occurred. Her own testimony shows beyond dispute

that, while she was laboring under mental strain, she was fully capable of making a contract, for she acted with the utmost caution, and refused to make any settlement under the policy, even though a very substantial sum was offered, until she finally met with her friends and submitted a counter proposal, which was accepted by Hicks. It is only natural that she should have been laboring under more or less mental strain, but this settlement occurred two weeks after the death of her husband, and there is no indication that she was lacking in that degree of mental capacity to make a valid contract. There was nothing hasty about the negotiations between appellee and Hicks, but there were different interviews during the period of two days, and this settlement was negotiated after deliberate conference, not only between Hicks and the others present at the meeting, but the counter proposal was agreed upon in Hicks' absence, and was submitted to him in appellee's presence by her friends and advisers. We are clearly of the opinion that the contract was entered into by appellee advisedly and deliberately, and that she was capable of making the contract at that time.

The final contention is that there was a mutual mistake as to the law which induced the settlement, and that appellee is not bound by it. It is a rule of almost universal application that a mistake of law, in the absence of fraud or undue influence, does not afford grounds for the abrogation or reformation of a contract. Such has been the rule declared by this court. *Lawrence County Bank* v. *Arndt,* 69 Ark. 406; *Phoenix Assurance Co.* v. *Boyette,* 77 Ark. 41. In those cases it was held that, where the contract was induced by reliance upon the superior knowledge of one of the parties, grounds for reformation were thus afforded, and this was found to be an exception to the general rule. Those cases, however, related to questions of the interpretation of the contract, and the effect of each of the decisions was that the court would place such interpretation upon it as was represented at the time of its execution by the party

having the superior knowledge on the subject. The present case is not one like those cited, which concern the representations made at the time of the execution of the original contract, but it is one where the representations or mistake arose at the time of the settlement of liability under the original contract. But, at any rate, this is not a case where the question of superior knowledge on the subject is important, for, as before stated, the parties were dealing at arm's length, and Hicks was representing an adverse interest, whilst appellee was acting upon the advice of those upon whom she relied in accepting as true the statement that there was no liability under the contract. This is merely an instance of adverse claims with respect to liability, and which was compromised and settled. If it be the law that, whenever parties settle their differences concerning liability in an uncertain state of the law and it afterwards turns out that they were mistaken the settlement can be disregarded, then there is no stability whatever about such a settlement, even though made in the utmost good faith. The law has been definitely settled to the contrary by the Supreme Court of the United States in the case of *Mutual Life Insurance Co.* v. *Phinney,* 178 U. S. 327, where the court, speaking through Mr. Justice Brewer, said:

"But whether that statement of the agent was correct in matter of law is doubtful; whether true or false, or, more accurately, whether correct or not, in its interpretation of the law applicable to this contract, is immaterial. It was merely a statement of what he supposed the law was, and the insured was under the same obligations to know the law that the company, or its agent, was. The jury evidently proceeded upon the supposition that the insurance company, located in New York, knew what the law of that State was; the insured, residing in Washington, did not, and when the agent stated what the condition of the contract was, he misrepresented the law of New York, of which the insured was ignorant, and, being ignorant, was not bound by any

act based thereon in the way of abandonment or rescission. But surely no such rule as that obtains. When two parties enter into a contract, and make it determinable by the law of another State, it is conclusively presumed that each of them knows the law in respect to which they make the contract. There is no presumption of ignorance on the one side and knowledge on the other.''

Upon the whole case we are convinced that there is no theory supported by legally sufficient evidence upon which appellee can escape the effect of her voluntary settlement and release of all claims against the company under the policy. There was no fraudulent mispresentation, nor duress, nor lack of mental capacity. It is merely a case of voluntary settlement of a disputed claim of liability, and the settlement is conclusive upon both parties.

It follows that the judgment must be reversed, and it is so ordered, and, the facts being undisputed, judgment will be entered here dismissing the complaint.

WOOD and HUMPHREYS, JJ., dissent.

HUMPHREYS, J. The undisputed testimony in the case shows that the settlement was procured upon the representation of V. Y. Hicks, an attorney from Chicago in the employ of the insurance company, that, under the law applicable to the suicide clause in the renewal policy, appellee could only recover two annual premiums. He professed to know the law, and assured appellee and her advisers that such was its effect. He was apprised by appellee and her advisers that they did not know the law, and that they were making settlement with him in reliance by them upon his representation. He was in error as to the law and its effect. The suicide clause was of no avail to appellant as a defense to the cause of action. Appellee was entitled to recover the face of the policy at the time the settlement was made. *New York Life Insurance Company* v. *Adams,* 151 Ark. 123. The law declared in the case cited was the law in Arkansas at the time Hicks induced the settlement by misstating the law and its effect to appellee. The most that can

be said for Hicks is that he thought he knew the law, and was in good faith. His good faith cannot help appellee unless the company pays her what it justly owed her at the time the settlement was induced. The misstatement of the law by one who professed superior knowledge induced the settlement. The settlement could not have been accomplished except through a mutual mistake of law. Under these circumstances the settlement should not be treated as an accord and satisfaction, and, for the reason stated, Justice WOOD and myself dissent from the majority opinion.