GALL *v.* UNION NATIONAL BANK OF LITTLE ROCK, TRUSTEE.

4-6677                                      159 S. W. 2d 757

Opinion delivered March 9, 1942.

*Mann & McCulloch* and *Edmond T. Norfleet,* for appellant.

*Moore & Moore* and *Moore, Burrow & Chowning,* for appellee.

HOLT, J. Mrs. Lillie M. Marston died testate May 14, 1939. She appointed W. H. Brown executor of her will.

February 26, 1934, Mrs. Marston executed a written trust agreement to appellee, Union National Bank of Little Rock, as trustee, under the terms of which she delivered bonds and securities of the value of $83,880, and directed the bank, as trustee, to hold, dispose of, invest and reinvest the trust property, to pay the net income therefrom to her (Mrs. Marston) during her lifetime and after her death to her son, F. R. Atkins in monthly payments not to exceed $300.

Upon the death of F. R. Atkins, the trust agreement provided that the trust should terminate and the trustee should distribute the corpus of the trust four-ninths to Mrs. Marston's brother, four-ninths to certain nephews and nieces and one-ninth to the American Bible Society.

Mrs. Marston reserved to herself in the trust agreement the power to revoke the trust in whole or in part,

using the following language: "The trustor has reserved to herself the right to revoke in whole or in part this trust by giving written notice to the trustee at least six months prior to the time the revocation shall take effect and in event of such revocation, trustor agrees to take and accept the trust estate, subject to all contracts and agreements, and in the form the same then exists."

July 27, 1936, Mrs. Marston entered into a writing with appellee trustee amending the trust agreement. The only effect of this amendment, however, was to provide for distribution of the corpus at the termination of the trust in fourteenth interests instead of the original ninth interests. In making this change, she named additional beneficiaries, including appellant, Juanita Gall, her granddaughter, to whom she gave a fourteenth interest. Appellant had been omitted in the first agreement. The last paragraph of the amended agreement provided: "All of the other provisions of said trust agreement are hereby ratified and confirmed."

Following the execution of these trust agreements, September 15, 1937, Mrs. Marston executed her will, under the terms of which she bequeathed to her son, F. R. Atkins, all the income from "my estate both real and personal wheresoever located during his natural life" and bequeathed to appellant, Juanita Gall, "all my estate both real and personal wherever located" after the death of F. R. Atkins. F. R. Atkins is the father of Juanita Gall.

March 5, 1940, Mallory Williams, claiming to be the administrator of Mrs. Marston's estate, filed suit against the trustee bank, the heirs and trust beneficiaries, seeking to have the trust agreements canceled on the ground that Mrs. Marston was mentally incompetent to dispose of her property at the time she executed the trust agreements.

June 17, 1940, W. H. Brown, as executor, filed a similar suit against the same parties as in the Williams suit, seeking to set aside the trust agreements on the same grounds alleged in the Williams suit, and prayed for an order impounding the corpus of the trust estate and for

an accounting of the trust properties from the trustee to Brown. Copies of the trust agreements were attached to and made a part of Brown's complaint.

The Williams suit and the Brown suit were consolidated by the court below.

August 14, 1940, the trustee bank filed answer, specifically denying that Mrs. Marston was incompetent at the time the trust agreements were executed by her, and copies of the trust agreements were made a part of the answer.

August 14, 1940, the defendants, beneficiaries of the trust agreements, filed their answer in all material respects similar to that filed by the trustee bank.

February 3, 1941, appellant, Juanita Gall, a co-defendant of appellees, trustee bank and beneficiaries under the trust agreements, filed separate answer in which she denied the mental incompetency of Lillie M. Marston at the time she executed the trust agreements and denied that they were invalid.

Juanita Gall also filed a cross-complaint, which covers more than ten pages of the record. The material allegations of her cross-complaint, as affect the issues here, are: that her grandmother, Mrs. Marston, was at all times prior to her death possessed of sufficient mentality to comprehend and transact business affairs, and to form and express her true intentions and desires with reference to the disposition of her property; that her grandmother was influenced in the execution of the trust agreement of 1934, and the amendment thereto of 1936, by her second husband, Frank K. Marston. Copies of these trust agreements were made a part of the cross-complaint, that after the death of Mr. Marston her grandmother evidenced great affection and preference for cross-complainant and that sometime after her grandmother executed the amended trust agreement, her grandmother expressed to her her intention to revoke the trust agreements and make a different disposition of all of her property so that at her grandmother's death F. R. Atkins, Juanita Gall's father, would have the income from her grandmother's property during his lifetime and at his

death all of her property would go to cross-complainant in fee simple.

She further alleged that her grandmother in an effort to carry out this intention, so expressed to cross-complainant, directed her attorney to prepare her will. This was done and the will was duly executed by the grandmother, Mrs. Marston. The fourth paragraph of the will was made a part of the cross-complaint and is as follows: "Fourth. I will, give, and bequeath to my beloved granddaughter, Juanita Atkins Gall, all my estate both real and personal wherever located, but she cannot have any of the income from my estate until after the death of my beloved son, Frederick Roberts Atkins, her father, it being the intentions of this will to give to my son the income from all my property during his natural life."

She further alleged that her grandmother inquired of her attorney, in whom she reposed great confidence, whether the terms of the will were sufficient to carry out her intention and desire to give all of her property in fee simple to her granddaughter, cross-complainant, at the death of F. R. Atkins, and was assured that the provisions of the will were sufficient to carry her intentions into effect.

Cross-complainant further alleged that from the date of the execution of her will September 15, 1937, until her death May 14, 1939, Mrs. Marston many times expressed that she had made a will giving all her property to appellant after the death of her father, F. R. Atkins.

She alleged that the advice given her grandmother by the attorney was not true "but states that the subject-matter of said advices was susceptible of accurate truth and knowledge by an attorney at the time, namely, that said will did not revoke said trust agreement upon the death of her grandmother and dispose of all she died possessed of including said trust estate thereunder"; that mutual mistake occurred between cross-complainant's grandmother and her attorney as follows:

"(a) Mutual mistake occurred at the time Mrs. Marston, deceased, made her last will and testament

aforesaid, in that, both she and her said attorney-scrivener believed said last will and testament was effective to carry out her said intentions, namely, to revoke upon her death said trust agreements and give to her son, Frederick Roberts Atkins, thereupon, for his lifetime enjoyment, the income from all she would die possessed of including the money, property, and securities constituting the corpus of said deceased's said trust estate, with full title thereto in fee simple and absolutely to cross-complainant, upon the death of her said father, but was not effective to carry out said intentions; or,

"(b)  Mutual mistake occurred at the time Mrs. Marston, deceased, made her last will and testament aforesaid, in that, there was no meeting of the minds as between said deceased and her said attorney-scrivener, as to the nature, effect and object of the paper then drawn, said will, which said deceased executed, with respect to said deceased's said intentions at the time, resulting in her execution of an instrument of writing, her said will, which was not effective to carry out said deceased's said intentions and wishes. . . .

"(c)  That mistake occurred upon the part of said Mrs. Marston, deceased, at the time she made her last will and testament, in that, when she made the same it was then her intention and she believed because of her said instructions to her said attorney and his said advices to her that she was thereby revoking upon her death said trust agreements, and was thereby upon her death giving to her son, said Frederick Roberts Atkins, for his lifetime, the income from all she would die possessed of, including the money, property and securities constituting the corpus of said trust estate established under her said trust agreements, with full title thereto in fee simple and absolutely to cross-complainant upon the death of her father, said Frederick Roberts Atkins, but contrary to her said intentions did not do so by her said will; that this mistake, and the mutual mistake complained of hereinabove, was induced by said deceased's attorney-scrivener under the facts and circumstances set out above, constituting an erroneous, and wrongful circumvention of the wishes of said deceased in the matter and a fraud

against said deceased in the final disposition of her property and worldly possessions, occasioned, however, without gain of any kind to said attorney-scrivener.''

Cross-complainant further alleged that she was lulled into a false sense of security by the advice of her attorney and that it was not until after her grandmother's death that cross-complainant learned that a mistake had occurred and that her grandmother's intentions were not carried out by the terms of her will, and cross-complainant's prayer was that the trust agreements be canceled and set aside; that an implied trust be declared in the hands of trustee bank; that possession of the corpus of the trust estate be awarded to the executor, Brown, for administration and distribution under the terms of Mrs. Marston's will, because of the alleged mistake and under the maxim ''Equity regards that as done which ought to be done.''

February 19, 1941, Union National Bank, as trustee, filed demurrer to the cross-complaint on the ground that it did not state facts sufficient to constitute a cause of action. On the same day the beneficiaries under the trust agreements filed demurrer alleging the same ground.

Upon a hearing both demurrers were sustained by the trial court and appellant's cross-complaint dismissed for want of equity. This appeal followed.

The primary question presented here is: Did appellant's cross-complaint state facts sufficient to constitute a cause of action?

The demurrers admit to be true, all allegations of fact in the cross-complaint that are well pleaded, and all reasonable inferences and deductions that can be drawn therefrom. *James* v. *Lloyd,* 196 Ark. 568, 118 S. W. 2d 284. A demurrer does not admit the pleader's conclusions of law. *Herndon* v. *Gregory,* 190 Ark. 702, 81 S. W. 2d 849, 82 S. W. 2d 244.

At the outset it may be said that the interest of F. R. Atkins, appellant's father, is not involved here for whether the trust agreements are sustained or canceled he gets the net income from the trust estate during his

lifetime. If the trust agreements are sustained, however, the interest of appellant, Juanita Gall, will be a one-fourteenth. Should the trust agreements be set aside, appellant would get the entire property under the will of Mrs. Marston upon the death of F. R. Atkins.

It will be observed that the cross-complaint alleges the mental competency of Mrs. Marston at all times prior to her death and especially on the dates the trust agreements and her will were executed. There is no allegation that at the time Mrs. Marston executed the first trust agreement and later the amendment thereto, she was imposed upon by the trustee bank or any fraud or deception practiced by the trustee, inducing the execution of the agreements. In fact, the cross-complaint treats the trust agreements as in all respects valid in their inception. It does allege that "sometime after her grandmother (Mrs. Marston) had made said amendment to the trust agreement" she desired to revoke the trust and make a new disposition of the corpus of the trust property and to this end consulted an attorney in whom she had great confidence. After conceding that the advice which Mrs. Marston received from her attorney was not correct, and that the will which she executed did not effectively revoke the trust agreements in accordance with her intentions, the cross-complaint then alleges mutual mistake on the part of Mrs. Marston and her attorney as to the effect of the will to carry out her intention to revoke the trust agreements, and further unilateral mistake on the part of Mrs. Marston based upon the incorrect advice of her attorney.

The cross-complaint does not allege that Mrs. Marston at any time before her death gave, or attempted to give, the trustee, Union National Bank, any notice, written or otherwise, of her alleged desire to revoke the trust agreements, nor is it alleged that the trustee knew prior to the institution of this litigation that Mrs. Marston had any such intention.

The trust agreement of February 26, 1934, as well as the amended agreement, expressly provided the only method by which Mrs. Marston could revoke these trust

agreements, and that is "by giving written notice to the trustee at least six months prior to the time the revocation shall take effect. . . ." Clearly this provision in the trust agreements requires Mrs. Marston to give written notice to the trustee in the manner provided, during her lifetime, if she would exercise the right reserved to her to revoke. No authority is reserved to her in the trust agreements to revoke by will and the cross-complaint makes no such allegation.

The rule seems to be well settled that where a trust agreement by its own terms sets out the method by which it may be revoked, it can be revoked only in the manner thus provided. The rule is stated in Restatement of the Law of Trusts, vol. 2, p. 994, in this language: "If the settlor reserves a power to revoke the trust only in a particular manner or under particular circumstances, he can revoke the trust only in that manner or under those circumstances. . . . If the settler reserves a power to revoke the trust by a transaction *inter vivos,* as, for example, by a notice to the trustee, he cannot revoke the trust by his will."

In 26 R. C. L., 1206, § 48, it is said: "Generally a valid trust is not affected by the death of the donor, testate, where he died without having exercised his power of revocation."

Mr. Perry in his work on Trusts and Trustees, 7th Ed., vol. 1, p. 135, § 104, states the rule as follows: "If express power of revocation has been reserved by the settlor it can be effectively exercised only in the manner prescribed by the trust instrument."

In *Kelley* v. *Snow,* 185 Mass. 288, 70 N. E. 89, it appeared that the trustor had created a trust out of certain personal property during her lifetime. The trust agreement provided: "Said Mary Ann Snow shall have the power to change the following dispositions at any time upon written notice to said Kelley (the trustee)." The trustor died leaving a will in which it was contended that Mrs. Snow had revoked the trust. The court, however, said: "It is true that she had the power to change its terms, but the power was conditioned upon giving

written notice to Kelley. This condition, especially when taken in connection with the entire absence of any express power by will, shows that the power was to be exercised and the changes were to take effect in her lifetime, and not by way of a will.''

In *Mayer* v. *Tucker,* 102 N. J. Eq. 524, 141 Atl. 799, a trust was created by a widow for the benefit of her son. The trust agreement reserved the right to revoke to the trustor. The rule announced in that case applies here. There the court said:

''The question presented (referring to the case of *Stone* v. *Hackett,* 12 Gray (Mass.) 227) was whether the trust was revoked by his will. Mr. Justice BIGELOW, writing the opinion of the court, over which Chief Justice SHAW then presided, states this rule on page 232 of the opinion:

'' 'A power of revocation . . . does not in any degree affect the legal title to the property. That passes to the donee and remains vested for the purposes of the trust, notwithstanding the existence of a right to revoke it. If this right is never exercised according to the terms in which it is reserved . . . until after the death of the donor, it can have no effect on the validity of the trust or the right of the trustee to hold the property.'

''The same principle is set out in 26 R. C. L. 1206, where it is stated that: 'If the right of revocation is not exercised during the lifetime of the donor or other person in whose favor it was reserved, the validity of the trust remains unaffected as though there never had been a reserved right of revocation.'

''The case cited in the footnote to this statement fully supports it. In view of this principle which seems to us to be a sound one, it would seem immaterial whether Mrs. Tucker intended by her will to exercise the power of revocation or not.''

Upon the execution of the trust agreements here in question it is clear that contractual rights were created among Mrs. Marston, the trustee bank, and the beneficiaries under the trust agreements, and Mrs. Marston could only destroy those rights by revoking the trust

agreements in the manner specifically set out therein. She had no power to revoke these trusts by will or in any other manner than that specified.

An intention acquired by Mrs. Marston after the execution of the trust agreements to revoke them was insufficient unless her intention was communicated to the trustee. As we have indicated, the cross-complaint does not allege that she ever communicated this intention to the trustee or that the trustee had any knowledge of such desire prior to this litigation.

The allegation in the cross-complaint that "Equity regards that as done which ought to have been done," we think, has no application here. Appellant urges that in accordance with her allegations in her cross-complaint that since it was Mrs. Marston's intention when she executed her will to revoke the trust agreements, and since according to the allegations she made her will, believing, upon the mistaken advice of her attorney that her will would operate to revoke the trust agreements, then equity rather than let her intention fail, should, by the application of the maxim, "Equity regards that as done which ought to have been done," give effect to the will as a revocation of the trust agreements and thus carry into effect her alleged intention.

We cannot agree to this contention. In discussing this maxim, together with its limitations, the textwriter in 19 American Jurisprudence 316, § 456, says: "The maxim in question is not of universal application; it may not be invoked so as to defeat the operation of statute or create a right contrary to the agreement of parties. Nor will the court consider an act to have been done if the consequences of doing so will be to cause injury or damage to third persons."

In 21 Corpus Juris, 201, § 191, it is said: "It cannot be invoked to create a right contrary to the agreement of the parties, or in disregard of essential conditions for which the parties have stipulated. The word 'ought' in the maxim imports an equitable obligation, not one purely moral or something merely advantageous or desirable; equity will regard as done only such things as

rest upon an obligation which equity would directly enforce."

Mr. Pomeroy, in vol. II of his Equity Jurisprudence, p. 14, § 365, 5th Ed., says of this maxim: "In the first place, it should be observed that the principle involves the notion of an equitable *obligation* existing from some cause; of a present relation of equitable right and duty subsisting between two parties—a right held by one party, from whatever cause arising, that the other *should* do some act, and the corresponding duty, the *ought* resting upon the latter to do such act. Equity does not regard and treat as done what *might* be done, or what *could* be done, but only what *ought* to be done."

In the case of *Cronbach* v. *Aetna Life Insurance Company*, 153 Tenn. 362, 284 S. W. 72, the court said: "While the maxim 'Equity regards that as done which ought to be done,' is regarded with favor, it can only be invoked when the party against whom complaint is made has failed or refused to perform some duty imposed upon him.

"It cannot be invoked to create a right contrary to the agreement of the parties, or in disregard of essential conditions for which the parties have stipulated. 21 Corpus Juris 201."

It thus appears that before appellant would be entitled to invoke this maxim, it devolved upon her to allege in her cross-complaint that Mrs. Marston did substantially all that was required to be done by her as a condition of revocation. No such allegation appears. Accordingly no duty rested upon the trustee, or the trust beneficiaries, to treat the trust as having been revoked.

It is finally insisted by appellant that the trust agreements should be set aside on the "ground of unilateral, as well as mutual, mistake," and quoting from appellant's brief: "Said mistake, as alleged in the cross-complaint as admitted by the demurrers, was unilateral upon the part of Mrs. Marston, deceased, with respect to appellee bank trustee. It was mutual, as alleged and admitted by the demurrers, with respect to Mrs. Marston, deceased, and her attorney-scrivener drawing her will.

Certainly, under the admitted facts, Mrs. Marston honestly believed she was carrying into effect her said intentions when she executed her will.''

It will be observed that the mistake complained of was not alleged to have been a mutual one between Mrs. Marston and trustee bank in the execution of the trust agreements. The mistake alleged was between Mrs. Marston and her attorney. There is no allegation in the cross-complaint that she executed the trust agreements by any mistake caused by her attorney's error. The allegation is that she signed the will under the mistaken belief that it would operate as a revocation of the trust agreements and that her mistake was induced by the erroneous advice of her counsel. Her allegation is, mutual mistake between her and her attorney, as well as unilateral mistake on the part of Mrs. Marston. The alleged mistake is in connection with a transaction to which the trustee and the beneficiaries were not parties and as to the existence of which they had no knowledge whatsoever. The mistake alleged is one of law as to the legal effect of the revocation clause of the trust agreements.

The general rule on setting aside instruments on the ground of mistake is stated in *Foster* v. *Dierks Lumber & Coal Company,* 175 Ark. 73, 298 S. W. 495, in headnote No. 1 as follows: ''Equity will cancel or reform written instruments, either where there is a mutual mistake, or there has been a mistake of one party, accompanied by fraud or other inequitable conduct of the other.'' Appellant, however, has not brought herself within this rule.

In *Rector* v. *Collins,* 46 Ark. 167, 55 Am. Rep. 571, this court quoted with approval from Pomeroy's Equity Jurisprudence, vol. 2, § 843, as follows: ''The rule is well settled that a simple mistake by a party as to the legal effect of an agreement which he executes, or as to the legal results of an act which he performs, is no ground for either defensive or offensive relief. If there were no elements of fraud, concealment, misrepresentation, undue influence, violation of confidence reposed, or of other inequitable conduct in the transaction, the

party who knows, or had an opportunity to know, the contents of an agreement or other instrument, cannot defeat its performance, or obtain its cancellation or reformation, because he mistook the legal meaning and effect of the whole, or any of its provisions."

The textwriter in 19 American Jurisprudence 84, § 67, says: "It seems to be the rule that a court of chancery will not ordinarily grant relief from the consequences of a mistake of law concerning the construction of a contract or other writing or the effect thereof on a party's rights. The rule was long since formulated that where parties, with knowledge of the facts, have made an agreement or other instrument as they intended it to be and the writing expresses the transaction as it was understood and designed to be made, equity will not allow a defense or grant a reformation or rescission, although one of the parties may have mistaken or misconceived its legal meaning, scope, or effect."

This court said in *Security Life Insurance Company* v. *Leeper*, 171 Ark. 77, 284 S. W. 12: "It is a rule of almost universal application that a mistake of law, in the absence of fraud or undue influence, does not afford ground for the abrogation or reformation of a contract. Such has been the rule declared by this court."

In *Hubbert* v. *Fagan*, 99 Ark. 480, 138 S. W. 1001, it is said: "Where relief is given because of the mistake of one party alone, it is where it is induced by the conduct of the other party or because the other seeks unconscionably to take advantage of it, and the ground of jurisdiction is really fraud."

And in *American Laundry Machinery Company* v. *Whitlow*, 198 Ark. 175, 127 S. W. 2d 817, we said: "In 12 American Jurisprudence 624, § 133, it is held, as the rule sustained by practically universal authority, that a unilateral mistake alone will not justify a rescission. May it not be sufficient to say the law upon this subject is black type textbook law."

Mr. Black on Rescission and Cancellation, 2d Ed., vol. I, § 128, p. 397, says: "The generally accepted rule is that rescission cannot be enforced or ordered on ac-

count of the mistake of one party only, which the other did not share, but for which he was not responsible, unless some special ground for the interference of a court of equity can be shown. That is, there can be no rescission on account of the mistake of one party only, where the other party was not guilty of any fraud, concealment, undue influence, or bad faith, did not induce or encourage the mistake, and will not derive any unconscionable advantage from the enforcement of the contract.''

On the whole case, finding no error, the decree is affirmed.