LOWELL PERKINS AGENCY, INC. *v.* Velma J. JACOBS and Russell JACOBS

5-5576                                          469 S. W. 2d 89

Opinion delivered June 21, 1971
[Rehearing denied August 9, 1971.]

*Lightle & Tedder,* for appellant.

*Darrell Hickman,* for appellees.

Carleton Harris, Chief Justice. This litigation arises out of a sale made by Lowell Perkins Agency, Inc., automobile dealers and appellant herein, to Velma J.

Jacobs, appellee herein.[1] On July 22, 1969, Mrs. Jacobs purchased a 1969, 4 door, 8 cylinder, Rebel automobile from the appellant for the sum of $3,044.20. This automobile was in the category of what is generally known as a "factory" car, being a vehicle that the manufacturer had rented to an agency and then, after a few thousand miles had been driven, was reclaimed by the manufacturer and reconditioned.[2] Such cars carry a full new car warranty. At the time of the transaction between the parties, Mrs. Jacobs traded in a 1966 Rambler automobile as a down payment of $645.00, and executed a purchase contract and note for the balance, this contract and note being hypothecated the following day to the Universal C.I.T. Credit Corporation in the usual course of business. On the same day, the purchased automobile was delivered to Mrs. Jacobs in Augusta, together with the papers, and the title and transfer papers were obtained from appellee for the 1966 Rambler. Thereafter, apparently also on the 23rd, Mrs. Jacobs applied for a license but was told by the revenue office that she would have to pay sales tax on the car, this tax amounting to $86.00 or $87.00. She then took the papers back to the salesman and advised that she did not want the automobile. Appellee went to see the manager of the automobile agency, Jack Stubbs, and learned that Mr. Perkins was in Little Rock. She advised that she would go home and wait for him to call, and that if he called by 3 p.m. and said that he would pay the tax, she would keep the car. No call was received and the following morning appellee called Perkins, told him that she was bringing the car over, and was going to have Universal C.I.T. cancel it. She said that he advised her that he could not cancel it and that he was not going

---

[1]Though the name of Mr. Jacobs appears as an appellee, the suit having been brought in his name as well as his wife's, he does not appear to have any interest in the proceedings. The contract of sale was strictly between the agency and Velma J. Jacobs, and she testified that the car belonged to her; accordingly, this opinion will only refer to the appellee.

[2]Marlin Stubbs, a car salesman for appellant, testified that such an automobile is handled like a demonstrator, and that customarily *i. e.*, meaning in the absence of an agreement, the purchaser pays the sales tax; the car comes from the manufacturer, and bears a dealer's tag.

to pay the tax on it. She then went to the Universal office and, according to her testimony, which will be subsequently discussed, was told by a Mr. Weir that the contract would be cancelled.[3] Appellee returned to the automobile agency, parked the car in the driveway, and gave the keys to the manager's wife.

Mrs. Jacobs, on August 19, instituted a replevin action for the 1966 Rambler, simply alleging that appellant was in possession of this property which belonged to her. However, no order of delivery was issued and no bond was made.

The first payment to Universal C.I.T. was due on August 22; Mrs. Jacobs had already sent a letter saying that she was not going to pay for the car, and on September 9, this company sent notice to appellee, in compliance with the Commercial Code, that unless she paid the amount due under the contract, including expenses of repossession and delinquent charges, within seven days, the car would be sold at private sale. Mrs. Jacobs received the notice, but made no payment. Perkins was then requested by the finance company to repurchase the contract, which was done, and thereafter this car was sold by appellant on October 22, for $2,565.78. The car traded in by appellee had been sold on September 3rd. Witnesses were not sure of the sale price but it is pretty well agreed that the value of the car was $600.00.

With reference to the suit filed by appellee, appellant moved to make the complaint more definite and certain and appellee amended to allege that appellant's agent had stated that no taxes would be due or payable on the automobile when the license was purchased; that she discovered that taxes would be due and payable and returned the vehicle "and rescinded the contract". An answer was filed denying the allegations of the complaint and both parties then moved to transfer the case to chancery court, which was done. There, appellee

---

[3]No "Mr. Weir" testified, but Mr. Billy Robinson, district manager for the company, testified that such a contract cannot be cancelled except by the dealer, who, of course, has to repurchase the car.

amended her complaint to allege unjust enrichment on the part of appellant company. On trial, the court found:

"1. On July 22, 1969, the parties entered into an agreement whereby the Plaintiff was to purchase a 1969 vehicle from the Defendant, and the Plaintiff traded in a 1966 vehicle of a value of $600.00.

2. Subsequently, the Plaintiff rescinded the contract by her actions, and the Defendant sold both of the vehicles.

3. It is the finding of the Court that the Plaintiff should recover from the Defendant the sum of $600.00, the value of the 1966 vehicle which she transferred to the Defendant."

Judgment was then entered against appellant for $600.00 together with interest and costs from which judgment (decree) appellant brings this appeal. For reversal, it is simply asserted that the evidence was insufficient to sustain a judgment for appellee.

We agree with appellant that the evidence is insufficient to sustain the decree. Of course, there is no evidence of mutual mistake, and so the sole question is when rescission is proper for a unilateral mistake. In *Hubbert* v. *Fagan,* 99 Ark. 480, 138 S. W. 1001, it is ·said:

"Where relief is given because of the mistake of one party alone, it is where it is induced by the conduct of the other party or because the other seeks unconscionably to take advantage of it, and the ground of jurisdiction is really fraud."

Likewise, in *American Laundry Machinery Company* v. *Whitlow,* 198 Ark. 175, 127 S. W. 2d 817, this court commented:

"In 12 American Jurisprudence 624, § 133, it is held, as the rule sustained by practically universal authority, that a unilateral mistake alone will not justify a rescis-

sion. May it not be sufficient to say the law upon this subject is black type textbook law."

In *Gall* v. *Union National Bank of Little Rock, Trustee,* 203 Ark. 1000, 159 S. W. 2d 757, we quoted from Black on Rescission and Cancellation, 2d Ed., Vol. I, § 128, p. 397, as follows:

"The generally accepted rule is that rescission cannot be enforced or ordered on account of the mistake of one party only, which the other did not share, but for which he was not responsible, unless some special ground for the interference of a court of equity can be shown. That is, there can be no rescission on account of the mistake of one party only, where the other party was not guilty of any fraud, concealment, undue influence, or bad faith, did not induce or encourage the mistake, and will not derive any unconscionable advantage from the enforcement of the contract."

What does the evidence show in the case before us? In the first place, the original complaint simply contained the allegations that the car belonged to appellee, and was being held by appellant. The amended complaint stated that she was told no taxes would be due or payable on the automobile when the license was purchased. This is the only allegation that bears on fraud or concealment, and the evidence, hereafter discussed, does not support that allegation. What is the evidence on this point? Mrs. Jacobs first testified that she was satisfied with the trade, and that title papers were delivered to her for the new car; she turned in the papers for the old one and said she thought she was getting a "good buy". She was then asked the following question "When you found out you had to pay the sales tax you wanted to rescind your contract?" The answer to that question is, we think, most pertinent, her reply being, "No I didn't. I thought it wasn't fair. *He should have told me I had sales tax to pay on this car* [Our emphasis] and I would have took the car had he agreed to pay the sales tax". Further,

"Q. He did not mislead you about that in any way?

A. No but he did not tell me either. * * * He should have made it clear to me. * * *

Q. That is the reason you decided you were not going to take the car or pay for it?

A. I agreed to pay for the car if he would call me about three o'clock but he did not have the courtesy to call me.

Q. It is not the tax but because he did not call you?

A. No if he had called me by three o'clock and said he would pay the tax, and he didn't call me.

Q. That was the condition you were making?

A. Yes."

It is thus apparent from the evidence of appellee herself that no one told her that she would not have to pay the sales tax. It was simply an assumption on her part. Certainly no fraudulent statements were made, nor was there undue influence, nor does the record indicate that the sales tax payment was intentionally concealed. Also, Mrs. Jacobs had every opportunity to acquire any information needed before the contract was signed, or to ask any question desired, for this apparently was no "hurried up" affair. It appears that while Mrs. Jacobs was conversing with Mr. Perkins in closing the transaction, that another lady came in who was bitten by the Perkins' dog, and this occasioned some delay in completing the transaction.[4] The statute (Ark. Stat. Ann. § 84-1903 [Repl. 1960]) provides who shall pay the tax, and we are unwilling to place the additional requirement that every purchaser must be told who will

[4]From the record of the testimony of Mrs. Jacobs: "But I stayed there four hours trying to get this contract signed while he called his lawyer, his wife and everybody else in the country about this dog bite. By that time I was getting a little bit unhappy but I really wanted the car and they knew it."

pay the tax or else his contract will be subject to rescission. For that matter, from the testimony of Mrs. Jacobs, it appears that the fact that she was due to pay the tax was not the sole reason she attempted to revoke the contract; also, she gave him a "deadline" of calling her by three o'clock and telling her that he would pay the tax "and he didn't call me". Actually, the testimony reflects that subsequently appellant company did agree to pay it. Marlin Stubbs, who had sold appellee the car, stated that the subject of who would pay the sales tax was never mentioned, but when she returned the day after the transaction, she wanted appellant to pay this tax; that the company had consented to pay one-half, but she replied that that was not good enough. She subsequently called again, and his father, Jack Stubbs, "told her we would pay the sales tax on it. Then she said 'Well, if you are willing to pay the sales tax, there is bound to be something wrong with the car' I said 'I guess you know the car is backed by five years, fifty thousand mile warranty. You have no right to be scared of the car.'"

The record reflects that the provisions of the Commercial Code were followed in selling the repossessed automobile, following Mrs. Jacobs leaving it at the company agency, and, of course the car which she was trading in was daily losing value from depreciation as it remained on the lot. The sale of this car could have been prevented simply by the making of a bond, but this was not done by appellee.

Appellee argues that her claim was for unjust enrichment and that the court properly found that appellant was enriched and "very unjustly". We do not agree with this contention. There can be no "unjust enrichment" in contract cases. In *Materese* v. *Moore-McCormack Lines,* 158 F. 2d 631, the matter is stated very succinctly as follows:

"The doctrine of unjust enrichment or recovery in quasi-contract obviously does not deal with situations in which the party to be charged has by word or deed legally consented to assume a duty toward the party

seeking to charge him. Instead, it applies to situations where as a matter of fact there is no legal contract, but where the person sought to be charged is in possession of money or property which in good conscience and justice he should not retain, but should deliver to another."

In 17 C. J. S. Contracts § 6 p. 574, we find:

"It is generally held that where there is an express contract the law will not imply a quasi or constructive contract. The courts will not indulge in the fiction of a quasi or constructive contract where contracts implied in fact must be established, and will not substitute one promisor or debtor for another. A quasi-contractual principle of unjust enrichment does not apply to an agreement deliberately entered into by the parties, however harsh the provisions of such contract may seem in the light of subsequent happenings."

This court has recognized this principle at least as far back as 1860, where in *Jackson* v. *Jones,* 22 Ark. 158, we stated that the law never accommodates a party with an implied contract when he has made a specific one on the same subject matter.

It is apparent from what has been said that we find the judgment entered to be erroneous, and the decree of the White County Chancery Court is accordingly reversed.

It is so ordered.