# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 01-1777

_____

| | | |
|---|---|---|
| Hall Contracting Corporation | * | |
| | * | |
| Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Eastern District of Arkansas. |
| Entergy Services, Inc. | * | |
| | * | |
| Appellee. | * | |

_____

Submitted:  September 13, 2002

Filed:  November 5, 2002

_____

Before BYE, BEAM, and MELLOY, Circuit Judges.

_____

BEAM, Circuit Judge.

In this diversity action, Hall Contracting Corporation ("Hall") appeals from the decision of the district court granting summary judgment in favor of Entergy Services, Inc. ("Entergy").  We affirm in part and reverse in part.

## I.    BACKGROUND

Entergy owns and operates the Remmel Dam on the Ouachita River near Hot Springs, Arkansas. Constructed in 1923, the dam is an "Amberson-style" gravity dam comprised of abutments on the north and south shores of the river and a spillway that spans the river and connects the two abutments. In 1996, Entergy solicited bids for a construction project designed to alleviate the Federal Energy Regulatory Commission's concerns relating to the structural integrity of the dam. The project involved removing debris from and cleaning "cells" in all three sections of the dam, filling the hollow cells with rock and concrete, and placing "anchors" in the dam's north abutment. Phase One of the project covered the debris removal and cleaning of the twenty-three spillway cells.

In preparation for submitting a bid on the project, Hall representatives toured and inspected the dam on at least two occasions. During those inspections, Entergy informed Hall that each cell would need to be cleaned down to bedrock at approximately 245.5 feet above mean sea level ("MSL"). Entergy also informed Hall that the catwalk above the cells was 275.5 feet MSL. Thus, by measuring the distance from the catwalk to the debris in each cell and then by subtracting that figure from the height of the catwalk, one could estimate the amount of debris above 245.5 feet MSL. According to Hall-representative Raleigh Jones, Entergy representatives estimated that each cell probably contained two to three feet of water, mud, and silt. Jones dropped a tape measure into approximately five of the twenty-three spillway cells during one inspection, but did not inspect or measure the debris in the other eighteen cells. Hall made no further inspection of the spillway cells.

Entergy invited bidders to bid on a time-and-materials basis for Phase One of the project. This would allow a contractor to be compensated for its labor, equipment, and material costs regardless of the actual amount of debris in the spillway cells. Believing it could obtain a competitive advantage, however, and

apparently relying on the rough figures and opinions supplied by Entergy regarding the debris in the cells, Hall decided to submit a lump-sum bid for the entire project. Entergy notified Hall that it was the successful bidder on October 3, 1996. On April 16, 1997, Entergy and Hall executed a contract for the Remmel Dam remedial construction project.

Hall mobilized for construction in May 1997 and, shortly thereafter, hired subcontractor Henderson Specialties, Inc. ("HSI") to perform Phase One. Hall and HSI agreed that a hydraulic electric pump would be the most effective method for removing the two to three feet of water, mud, and silt that they believed was in the cells. Entergy's engineer, Keith Dickerson, approved this approach. But HSI's removal operations revealed debris in much greater volume and of much bulkier composition than anticipated. The bedrock was well below 245.5 feet MSL in some places, and some cells apparently contained nearly ten vertical feet of debris that included large rocks, boulders, wooden forming materials, and a small railroad car. Instead of a hydraulic pump, HSI used backhoes and other heavy machinery to haul the debris through eight-by-eight-foot holes that it cut into the downstream wall of each cell.

The agreement provided that a contractor "waives all claims for . . . additional compensation beyond that allowed in this Agreement . . . unless the claim is expressly authorized . . . and is made in accordance with" specific procedures for submission, approval, and payment. At various times during construction, Hall submitted written change-order requests, and Entergy approved and paid for the changes, according to the contract procedures. One such request related to the debris discovered below 245.5 feet MSL. Hall did not, however, submit change-order requests for debris above 245.5 feet MSL or for the additional costs of removing the bulkier debris. HSI completed Phase One, and Hall ultimately completed the project, but at substantially greater cost than they originally contemplated in their respective bids. HSI then brought an arbitration proceeding against Hall to recover the extra costs. Hall and

HSI settled their dispute on December 2, 1999. Meanwhile, Entergy withheld payment of Hall's final invoice, invoking a provision in the contract that required Hall to provide "satisfactory evidence of no undischarged liens arising because of the Work." According to Entergy, Hall had not produced such evidence.

Hall brought this action in the district court to recover its final payment (the "retainage") and the additional costs associated with Phase One. Hall argues that any conceivable "lien" within the meaning of the contract's retainage provision has been effectively discharged by Arkansas statutes of limitation. Entergy counters that "undischarged liens" should be read broadly to include the possibility of a judgment lien resulting from this action. With respect to the Phase One costs, Hall asserted breach of contract, mutual mistake, unjust enrichment, and fraudulent misrepresentation. Entergy responded that the contract governs claims for additional compensation and that, by failing to follow the contract's change-order procedures, Hall waived any claims relating to Phase One. The district court granted Entergy's motion for summary judgment on all counts. Hall appeals the district court's order with respect to all but the fraud claim.

## II.    DISCUSSION

We review de novo the district court's grant of summary judgment, viewing the evidence in the light most favorable to the non-moving party and giving that party the benefit of all reasonable inferences. Fed. R. Civ. P. 56(c); Mathes v. Furniture Brands Int'l, Inc., 266 F.3d 884, 885 (8th Cir. 2001). Reasonable inferences are those that may be drawn without resorting to speculation. Sprenger v. Fed. Home Loan Bank, 253 F.3d 1106, 1110 (8th Cir. 2001). Under Arkansas contract law,[1] a court

---

[1]Section 50 of the contract states that it "shall be governed and construed in accordance with the laws of the state in which the applicable Owner's site . . . is located." The Remmel Dam is located in Arkansas.

considering a motion for summary judgment ascertains, with the same favoritism to the nonmovant, "the plain and ordinary meaning of the language in the written instrument, and if there is any doubt about the meaning, there is an issue of fact to be litigated." Carver v. Allstate Ins. Co., 76 S.W.3d 901, 904 (Ark. App. 2002). And "[w]hen the intent of the parties as to the meaning of a contract is in issue, summary judgment is particularly inappropriate." Id.

## A.    The Retainage

Section 8.5 of the contract provides: "Payment of Contractor's final invoice under a particular Contract Order is conditioned upon final completion of the Work described in the Contract Order, Owner's acceptance thereof, and receipt by Owner of satisfactory evidence of no undischarged liens arising because of the Work." Entergy does not allege that Hall did not complete the work it contracted to perform, and there is no indication that Entergy did not accept Hall's work on the project. Entergy asserts, however, that Hall failed to provide "satisfactory evidence of no undischarged liens arising because of the Work." It has withheld Hall's final invoice payment of $354,114 on that basis.

Hall argues that section 8.5 can only be read as referring to statutory mechanic's or materialmen's liens designed to secure payment for work and materials provided by construction contractors. Hall contends that the expiration of all statutory limitation periods for filing such liens[2] constitutes "satisfactory evidence of

---

[2]Under Arkansas law, mechanic's and materialmen's liens attach "from the time that the construction or repair first commenced." Ark. Code Ann. § 18-44-110(a)(1). In order to perfect and enforce construction liens, a contractor must provide the owner with statutorily prescribed notice of non-payment within 75 days of completion. Ark. Code Ann. § 18-44-115(e)(2)(A) & (B). Then the contractor must file a lien account with the applicable circuit court clerk within 120 days. Ark. Code. Ann. § 18-44-117(a). Finally, section 18-44-119 provides that "[n]o lien shall continue to exist . . .

no undischarged liens" since, once the liens are time-barred, Entergy is no longer exposed to any threat of lien liability.

Entergy argued in its motion for summary judgment that it was entitled to withhold Hall's final payment "[u]ntil Hall can provide Entergy with proof that HSI's claim has been resolved." Appellant's App. Vol. I, at 218. There is some indication in the record that while Hall had, in fact, obtained lien-waiver certificates from other subcontractors, it had not obtained a waiver from HSI. But in response to Hall's contention that all potential liens have been "discharged" by statutes of limitation, Entergy now argues on appeal that the possibility of a judgment lien resulting from this litigation entitles it to continue withholding the retainage. The district court apparently agreed with Entergy's new construction of section 8.5, and added that, in any event, the res judicata effect of a judgment in favor of Entergy on all other counts would then entitle Hall to the retainage, less litigation fees.

We reject Entergy's construction of section 8.5. It is difficult to see why the res judicata effect of a judgment is any better evidence of "no undischarged liens" than a statutory bar. We find that the plain and ordinary meaning of "liens arising out of the Work" includes mechanic's and materialmen's liens, but does not include the future possibility of a judgment lien. Under Entergy's view, a project owner, armed with a similar retainage provision, could always withhold final payment for any reason or for no reason at all for at least the period of a general contract statute of limitations. In addition, the moment a contractor initiated legal proceedings to recover the payment, the possibility of a resulting judgment lien would then justify a continued withholding and entitle the owner to retain the payment until the absolute

---

. . for more than fifteen (15) months after the lien is filed, unless within that time an action shall be instituted as described in this subchapter." There is no evidence that HSI or any other subcontractor has filed a lien or commenced any action against Entergy pursuant to the statutory provisions, and all of the statutory deadlines have long since expired.

conclusion of the litigation in its favor. Hall correctly observes: "This is bootstrapping of the first order." Appellant's Reply Brief at 3. Although Entergy may have initially been authorized to withhold payment based on the course of conduct between the parties relating to lien waivers, we agree with Hall that the expiration of all statutory periods of limitation for mechanic's and materialmen's lien filings constitutes "satisfactory evidence of no undischarged liens." Summary judgment in favor of Entergy on count one was improper. We reverse and remand to the district court with instructions to enter judgment in favor of Hall on count one with imposition of maximum interest of any description and a corresponding reduction in attorney's fees under Arkansas Code Annotated § 16-22-308.

### B. Claims for Additional Compensation

Remaining counts two through four relate to Hall's claim for additional compensation arising from the unexpected volume and composition of debris in the spillway cells.

### 1. Waiver of Contract Procedures

Hall first contends that Entergy's refusal to pay additional compensation for Phase One constitutes a breach of contract. Entergy argues in response that, by failing to comply with contract procedures, Hall has waived any claims for additional compensation. RAD-Razorback Limited Partnership v. B.G. Coney Co., 713 S.W.2d 462, 466 (Ark. 1986), states the applicable Arkansas law on this point: "The general rule pertaining to construction contracts is, absent a waiver . . ., if it is required, a request for additional compensation must be in writing and cannot be made after the work is completed." Hall does not dispute its failure to comply with change-order procedures, but argues instead that Entergy (1) waived strict compliance through its course of conduct, and (2) had actual knowledge of the debris conditions in the spillway cells.

Section 6.4 of the contract clearly states: "Contractor hereby waives all claims for schedule extensions or additional compensation beyond that allowed in this Agreement or by a Contract Order, unless the claim is expressly authorized under this Agreement and is made in accordance with the following procedures." Sections 6.2, 6.4, and 37.3 then provide detailed procedures for the submission, approval, and payment of such claims. But according to Hall, Entergy would normally first approve change-order requests orally. Hall would only commence the written change-order procedures after it had obtained oral approval. It would then memorialize the modification with the required paperwork. Hall claims that Entergy denied Hall's initial request for additional compensation arising from the debris conditions, thus rendering a written request futile. The district court found, however, that Hall had "simply not met its burden of showing that the custom, practice and conduct of the parties was that written requests would only be made once oral approval had been received and so there is no basis for a finding of waiver." We agree.

Even accepting Hall's evidence of waiver at face value,[3] Hall has not presented evidence sufficient to create a fact question or to justify a finding of waiver under Arkansas law. In Rivercliff Co. v. Linebarger, 264 S.W.2d 842, 846 (Ark. 1954), the Arkansas Supreme Court found that a waiver had occurred where several changes "had been made and paid for during the construction . . . yet . . . only one written

---

[3]Hall contends that the district court improperly weighed the evidentiary value of project-manager Mike Milton's affidavit. Finding numerous contradictions between the affidavit and Milton's earlier deposition testimony, the district court ruled that Hall could not rely on Milton's "discredited" affidavit to resist summary judgment. It relied on our holding in RSBI Aerospace, Inc. v. Affiliated FM Insurance Co., 49 F.3d 399, 402 (8th Cir. 1995), to the effect that "parties to a motion for summary judgment cannot create sham issues of fact" when "earlier testimony is in conflict with the affidavits." While we note, after a careful comparison of the testimony and affidavit, that the district court's application of RSBI was perhaps overbroad and its reading of the evidence mistaken in places, we find that the evidence, even when fully credited, is insufficient to create a triable issue of fact.

change order had been made." Likewise in J.N. Heiskell v. H.C. Enterprise, Inc., 429 S.W.2d 71, 74-75 (Ark. 1968), the court found that a fact question as to waiver was properly submitted to the jury where the contractor had presented evidence that oral changes were approved and paid for on "many occasions." Finally, we held in Falcon Jet Corp. v. King Enterprises, Inc., 678 F.2d 73, 77 (8th Cir. 1982), that waiver had occurred where virtually *all* changes had been approved orally. In contrast, it is undisputed in this case that Hall submitted several change orders, and Entergy paid them, according to the contract procedures, while there is no evidence that Entergy ever approved and paid for any changes without the required paperwork. The district court correctly found the evidence of waiver insufficient to create a triable question of fact.

Hall's contention that Entergy had actual knowledge of the debris conditions and therefore cannot equitably require compliance with contract procedures is likewise without merit. The two cases Hall cites on this point, St. Louis I.M. & S. Ry. Co. v. Shepherd, 168 S.W. 137 (Ark. 1914), and Marion County Rural School District No. 1 v. Rastle, 576 S.W.2d 502 (Ark. 1979), are inapposite. First, neither of these cases involve contractually required change-order procedures. Second, and more importantly, the contracts at issue in the cases are not construction contracts. RAD-Razorback definitively establishes that, absent a waiver, change-order provisions in construction contracts will be strictly enforced in the state of Arkansas. 713 S.W.2d at 466. We find that Hall has not provided sufficient evidence to create a fact question on whether Entergy waived compliance with change-order procedures. By failing to comply with those procedures, Hall forfeited its right to seek additional compensation under the contract.

## 2. Mutual Mistake

Hall next contends that the contract should be reformed because it was the result of a mutual, material mistake as to the volume and composition of debris in the

spillway cells. Under Arkansas law, parol evidence is admissible to establish a mutual mistake, but "must be clear and convincing before reformation is justified." Mizell v. Carter, 504 S.W.2d 743, 745 (Ark. 1974). In the aggregate, Hall's evidence on this point is not clear and convincing, but establishes only that Entergy sources occasionally expressed opinions or estimates about the debris in the cells.

Moreover, the contract unequivocally allocates the burden of inspection and the risk of mistake to Hall. The Restatement (Second) of Contracts § 152(1) (1979) states that a mutual mistake renders a contract "voidable by the adversely affected party unless he bears the risk of the mistake under the rule stated in § 154." According to section 154, "[a] party bears the risk of mistake when . . . the risk is allocated to him by agreement of the parties." This is clearly the case here. Section 37.1 of the agreement requires Hall to make its own inspection and assessment of the "nature and quantity of surface and subsurface materials to be encountered" and the "equipment and facilities needed preliminary to and during performance." And section 37.2 states that information provided by Entergy does not relieve Hall of its duty to inspect. Under both the contract and the Restatement, Hall clearly bore the risk of mistake. While no Arkansas case expressly adopts section 154, the district court correctly applied Crookham & Vessels, Inc. v. Larry Moyer Trucking, Inc., 699 S.W.2d 414, 416-17 (Ark. 1985), which essentially employs a pre-existing duty approach: "'Where one agrees to do, for a fixed sum, a thing possible to be performed, he will not be excused or become entitled to additional compensation because unforeseen difficulties are encountered.'" Id. (quoting Baton Rouge Contracting Co. v. West Hatchie Drainage Dist. of Tippah County, 304 F. Supp. 580, 585 (N.D. Miss. 1969)).

Hall's argument that its inspections were reasonable and that it reasonably relied on Entergy's representations is without merit. The contract "squarely placed the risk of uncertainty as to site and soil conditions on the contractor." Green Const. Co. v. Kan. Power & Light Co., 1 F.3d 1005, 1009 (10th Cir. 1993). And the fact that

-10-

Entergy invited bids on a time-and-materials basis in order to allow for changed conditions is further evidence that Hall assumed the risk of changed conditions by submitting a lump-sum bid. The district court correctly granted summary judgment in Entergy's favor on count three.

### 3. Unjust Enrichment

Hall next argues that, even if there was no breach of contract or mutual mistake, Entergy has been unjustly enriched by Hall's and HSI's "extra" work on Phase One. We reject this argument. Under Arkansas law, the doctrine of unjust enrichment does not apply when there is a valid, legal, and binding contract. See Lowell Perkins Agency, Inc. v. Jacobs, 469 S.W.2d 89, 92-93 (Ark. 1971). Arkansas courts have recognized some exceptions to this general rule. Friends of Children, Inc. v. Marcus, 876 S.W.2d 603, 605 (Ark. App. 1994). For example, restitution might be available "where the parties to a contract find they have made some fundamental mistake about something important in their contract." Id. But since the district court found, and we agree, that there was no mutual mistake in the formation of this contract, there is no basis for resorting to quasi-contract. Hall's argument to the contrary is without merit; it repeatedly cites cases that permit restitution despite contracts that are *void*. Friends of Children represents the Arkansas rule for cases with valid contracts. The district court properly granted summary judgment for Entergy on count four.

## III. CONCLUSION

For the reasons set forth above, we reverse the district court's grant of summary judgment as to count one and remand for disposition consistent with this opinion. We affirm the district court with respect to the remaining counts.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.