RIVERCLIFF COMPANY, INC. *v.* LINEBARGER.

5-149                                        264 S. W. 2d 842

Opinion delivered February 8, 1954.

[Rehearing denied March 15, 1954.]

*Martin K. Fulk* and *William H. Donham,* for appellant.

*Wright, Harrison, Lindsey & Upton, Eichenbaum, Walther, Scott & Miller* and *Wm. M. Moorhead,* for appellee.

WARD, J. This appeal involves the final settlement between the Linebarger Construction Company which constructed Rivercliff Apartments in the City of Little Rock for appellant, or more specifically it involves the alleged errors in the report of the special Master who made certain findings of fact and conclusions of law. All construction was to be performed according to the terms of a detailed contract and plans, and under the direction of an architect. For convenience the appellant, the Rivercliff Company, Inc., which is the owner of the apartments, will be referred to as "Rivercliff," and W. E. Linebarger and R. W. Linebarger, d.b.a. as Linebarger Construction Co., one of the appellees, will be referred to as "Contractor." The United States Fidelity and Guaranty Company is one of the appellees but makes no separate contentions in this action.

The specific points presented for our consideration come to us in the manner presently set out.

On September 11, 1950, the Contractor filed suit in Circuit Court against Rivercliff to recover the sum of $15,000 alleged to be due under an arbitration award made by the parties pursuant to an earlier attempt to settle their differences. Rivercliff answered that the arbitration award was void, filed a cross-complaint against the Contractor, and moved to transfer to equity. The cause was transferred, where the arbitration award was set aside, and now passes out of the case.

After numerous pleadings and amendments to the pleadings were filed the Chancery Court appointed Rodney Parham as special Master to hear testimony on the conflicting claims and to make and report findings of

fact and conclusions of law for the court's guidance and consideration.

During a period of two years and three months the Master took testimony which, together with numerous exhibits introduced, constitutes a voluminous record, and then submitted his detailed report, awarding to Rivercliff the sum of $29,696. The Master's report was approved in all respects by the court with the exception that the court found a mathematical error in the report and increased the amount due Rivercliff to $31,397, and rendered a decree for that amount.

Rivercliff has appealed from the decree of the court on two issues only, contending that "the Master [and the court] erred in his conclusions of the law applicable to the uncontested or undisputed facts." Specifically, Rivercliff has appealed on only two issues, both of which will hereafter be separately discussed. The Contractor has cross-appealed, alleging "but one issue" for affirmative relief. As these three issues are discussed below in the order mentioned the testimony [much of which is not disputed] will be referred to in each instance as it is deemed necessary.

1. *Expansion Joints.* The Master allowed Rivercliff the sum of $1,612.80 as compensation for the Contractor's failure to comply with the contract plans and specifications which called for "expansion" joints, one-half inch in width, between the brick walls and the concrete pillars at the corners of each of the four buildings —the space to be filled with oakum which is a pliable substance. It is not disputed that hard mortar was used instead of oakum, and appellant contends this caused serious cracking of the brick, resulting in damage to the extent of approximately $75,000. It is not disputed by the Contractor that the brick has cracked or that the walls are now in poor condition, nor is the amount necessary for a complete repair job seriously denied. The Contractor's defense is that the extensive damage is not the result of failing to use oakum in the joints.

The Master found that it would cost $73,565 to completely correct the condition that now exists, but he also

found that the existing condition of the walls was not the result of the failure of the Contractor to comply with the contract specifications.

After a careful review of the testimony and an examination of the plans and drawings, we reach the same conclusion the Master did as to the cause of the damage. We cannot put our reasons for this conclusion in better words than those used by the Master:

"The plans and specifications show, and an inspection by the Master, at the request of the parties, confirms that the interior or tile pumice block wall and the face brick outer wall are bonded together at the point of the expansion joint by solid brick masonry set in an especially hard mortar. The evidence discloses beyond contradiction that the expansion coefficient of the inner block wall is greater than that of the outer brick wall and I am of the opinion, based on the testimony of the experts and the physical examination, that all or the major part of the rupture of the brick would have occurred irrespective of the omission of the expansion joint or the creation of the rigid joint by the mortar between the brick and the concrete column, and that the defendant, Rivercliff Company, has not met the burden of proof of this issue, but that it is entitled to recover the cost of the installation of the joint in the amount of $1,612.80 under its contract with the plaintiff."

Appellant presented a number of experts in the architectural and constructural field of engineering to show that no rupture in the walls would have occurred if the joints had been built as they were designed, but a like number and caliber of experts testified for appellees that the rupture would have occurred even though the joints had been constructed according to specifications. The burden was on appellant to sustain its contention, and we cannot say the Master's finding that it has not done so was against the weight of the evidence. The testimony produced on the point considered was conflicting and we recognize that the Master was in a better position than we are to properly evaluate it and correlate it with the

plans and designs because he made a personal inspection of the walls of the buildings.

In this connection appellant seeks to sustain its contention on another ground. It is pointed out that when the Contractor's attention was called to the fact that the joints had not been properly caulked and that the walls were in bad condition, the Contractor, in consideration of being paid a balance of $112,713.50 claimed due under the contract, agreed by correspondence to make all necessary repairs, and that it would enter into a contract with a reliable Waterproofing Company to do the job on a guarantee basis. The record supports this contention to some degree and it further shows that it would have cost the amount fixed by the Master to correct all the defects, but the record further shows, we think, that appellee's agreement was to correct the caulking of the joints and not to repair all damage to the brick walls. One of the letters relied on to support the alleged agreement was to the Contractor, dated December 6, 1948, in which the correction work was referred to in this way:

" '2. Caulk and waterproof expansion joints between the outside brick masonry and monolithic concrete corners. This expansion joint was filled with brick mortar which is to be removed and the joints caulked with oakum and mastic compound as per plans and specifications.' "

Another letter to appellee, dated January 18, 1949, demanded that all cracked and broken bricks be removed and replaced by new brick. In appellee's reply the next day he agreed that any broken brick would be *tuck-jointed* as had already been done on Building No. 1.

The evidence shows that the Contractor made efforts to extract the mortar from the joints and replace it with oakum but found it impracticable to do so because the condition of the brick walls was such that, in the effort, adjacent bricks would be disturbed or damaged and that the interior walls of the apartments would also be extensively damaged. In fact, it appears that to entirely correct the situation it would have been necessary to

practically remove and rebuild the corners. This being the situation it appears that it would do more harm than good to merely dig the mortar from the joints and replace it with oakum. For this reason the Master gave appellant the amount it would have cost the Contractor to build the joints right originally, and we agree.

We have reviewed all the testimony tending to show that the Contractor agreed to do certain repair work and recognize the force of appellants' argument on this point, but, on the whole, we cannot say the preponderance of the evidence shows that he ever agreed to do all the repair work demanded by appellant, and especially that he did not do so at a time when he fully realized that he might not be legally responsible. It may be significant, as pointed out by appellees, that the joints in question were not designated as "expansion" joints in the specifications, but that this term was apparently adopted after litigation became likely.

2. *Compensation for Extra Foundation Excavation.* The Contractor filed a claim for $16,954.92 which was based on the following contention. The contract specifies that the foundation for the walls be placed one foot and three inches below the surface of the ground. The architect, evidently contemplated that most of the foundation would rest on solid rock because his estimate showed 990 cubic yards would have to be excavated, while in fact the amount turned out to be only 56 cubic yards. In all events it was obvious that some of the foundation would have to be on loose rock or dirt and, in this event, the specifications required the foundation to be some wider at the base but not deeper. When it developed in the course of excavation that much of the foundation would rest on dirt or loose rock, the owner-architect required the Contractor, in such instances, to excavate some four or five feet deeper for the foundation, and appellees' claim is for this extra expense. Incidental to the claim for extra excavation, and included in the amount before mentioned, appellees claimed $6,397.63 because the Contractor was forced to construct a quantity of concrete pipe trenches which would not have been necessary if he

had been able to cut the trenches out of solid rock as the architect evidently contemplated. This item of $6,397.63 was disallowed by the Master and the trial court on the ground that it was not shown it cost more to construct the concrete pipes than it would have cost to cut openings out of rock, and that it only amounted to substituted work. Appellee makes no objection to this part of the decree. The trial court did find that the Contractor was entitled to the difference or the sum of $10,557.29 as extra expense due to the extra excavation.

Rivercliff has appealed from the above finding, and seeks a reversal on two principal grounds.

First, by reference to the evidence, it is shown that, due to the fact that it costs more to excavate solid rock than it does to excavate loose rock, the overall result was that it actually cost the Contractor less to build the foundation in the manner in which it was built than it would have cost if there had been as much solid rock as the architect estimated. We, however, do not agree with appellant in this contention. There is practically no conflict in the testimony in this connection and it would serve no useful purpose to refer to it in detail. It is obvious that, since the specifications called for only one foot and three inches of excavation and since there was only 56 cubic yards of solid rock to be excavated instead of 990 cubic yards, the Contractor would have been able to realize a sizeable profit on this particular part of his contract if he had been allowed to construct the entire foundation at the depth specified. In the above eventuality it is not contended, nor could it be successfully contended, that appellee would not be entitled to the resulting profit, because the Contractor was to be paid a lump sum for the completed job. But the situation here is that appellant required appellee to deviate from the specifications and do extra work for which he is entitled to pay. The fact that appellee might have known, as the evidence indicates, that there was not as much solid rock excavation as the specifications showed, does not alter the situation. It might well be that knowledge of this fact by the Con-

tractor at the time he signed the contract influenced him in accepting the amount which he was to receive.

For a second ground, appellant contends that the Master and the trial court should not have made any allowance to the Contractor because the extra work was not authorized in accordance with the terms of the contract. This contention appears to be supported by the terms of the contract, which provides that extras must be approved in writing prior to execution. This provision was not complied with but it does not constitute a defense available to appellant, because, as we hold, a strict compliance with this provision of the contract was waived by appellant in this instance. It is not disputed that the extra excavation was done with the knowledge and at the direction of Smith who was not only the architect supervising the work for Rivercliff but was also a part owner of the appellant corporation. From his testimony we gather that he refused to approve an allowance for extras mainly because he did not think the Contractor was entitled to anything as a result of the changed method of constructing the foundation. It appears that other changes in construction had been made and paid for where no written change order had been previously issued. Although it was shown that several such changes had been made and paid for during the construction of the four buildings, yet Mr. Smith testified that only one written change order had been made.

We have considered the numerous authorities presented by appellant in connection with these contentions but we do not find them applicable in the situation here, and a discussion of them would serve no useful purpose.

3. *Cavity Walls.* On cross-appeal the Contractor seeks to reverse the finding of the Master [approved by the trial court] that Rivercliff was entitled to $29,212.00 because he failed to properly construct cavity walls.

Under the terms of the contract he was to construct outer brick walls so as to leave a one inch space for the circulation of air between them and the inner walls of pumice blocks, with small outlets at the base to discharge

the accumulating moisture. The two walls were to be bound together at intervals with metal ties. The Master found, and we agree, that in constructing the walls excessive mortar was allowed to drop and accumulate at the base of the walls, and that the droppings were so excessive that, in places, it formed a junction between the two walls. It also appears from the testimony that the above condition prevented the proper circulation of the air and destroyed the purpose for which the cavity walls were designed. The evidence, we think, sustains the Master's finding that the above condition has resulted in much damage to the outer walls and to the interior of the apartments, and further that the sum allowed for damages was justified. We do not understand that appellees question the evidence on which the above conclusions were reached, but he urges error on another ground as hereafter set out.

The Master stated appellees' defense in this way:

"The defense of the plaintiff to this claim is that the cavity designed by the architect was faulty in that it should have been two inches or more in width and therefore it is not liable for any resulting damage for failure to construct the same as designed."

Appellees state their objection and their defense thus:

"The defense of appellee to this claim was not simply that the cavity should have been two inches or more in width, but rather that the cavity must be at least two inches wide for the brick masons to build it without excessive mortar droppings and bridging; that in the construction of a one-inch cavity wall excessive mortar droppings in the bottom and excess bridging of the wall is the unavoidable consequence of working with the excessively narrow cavity. Thus the appellee's position is that this design defect, as well as others violating the principle of a cavity wall, are responsible for the failure of these walls to successfully turn water.

"Appellee's proof shows not that the cavity should have been two or three inches wide in order for a cavity

wall to *function* properly—which seems to be the interpretation placed on it by the lower court. Instead, this proffered proof asserts that if the cavity had been specified as two inches or more in width, it *could have been built* without excessive mortar droppings and bridging; that a *one-inch cavity cannot be built* free of excessive mortar droppings and bridging.''

The distinction drawn by appellees between the two views appears to be more of form than of substance, but, in all events, we do not find that his contention is supported by the evidence. Although appellees showed that certain Building Codes and authorities recommend a cavity space of two inches, and presented expert witnesses who testified that a two-inch space was a minimum requirement, yet we think there were other testimony and facts which are sufficiently persuasive to support the finding of the Master and the court. In the first place it is significant that the specifications for a one inch cavity were known and apparently approved by all parties concerned without objection on the part of the Contractor, and that, with this knowledge, he proceeded to construct the walls. Although it might have been difficult to do so yet it does not appear that competent and careful workmen could not have built the walls without allowing mortar to fall into the cavity to the extent it did here. It was, of course, the duty of the Contractor to employ workmen of skill and it was his duty also to furnish adequate inspection. If the Contractor had done this, either the result would have been satisfactory or he would have learned shortly after beginning work that it could not be done. In the latter event he should have notified appellant and sought a change in plans, but this was not done. Also there was testimony by appellant that the brick work revealed poor workmanship, and the Master who made a personal inspection of the walls had an opportunity to evaluate that testimony. The record shows that the Master considered appellees' view point

in this connection when he made his findings, and we cannot say they are against the weight of the evidence.

The decree of the trial court is affirmed.

The Chief Justice dissents.

Justice ROBINSON not participating.