J. N. HEISKELL ET AL v. H. C. ENTERPRISE, INC.

5-4478                                    429 S. W. 2d 71

Opinion delivered May 13, 1968
[Rehearing denied July 15, 1968.]

*Rose, Meek, House, Barron, Nash & Williamson,* for appellants.

*Howell, Price & Worsham,* for appellee.

J. FRED JONES, Justice. This appeal is from a judgment of the Pulaski County Circuit Court and arises from litigation growing out of the construction of the

Little Rock Public Library building because of defect in the construction of concrete floors. H. C. Enterprise, Inc. was the general contractor for the construction of the building; J. N. Heiskell et al, constituted the Library Board of Trustees, and Guy Swaim and James C. Wellborn, d/b/a Swaim, Allen, Wellborn '& Associates, were the architects for the building.

In order to permit work on the various levels of the building to proceed without damage to finished floors, the plans and specifications prepared by the Architects called for the concrete floors to be poured in two separate slabs or layers. The base slab, containing coarse aggregate, was to be poured in forms and was to be from four to five inches thick. The base slab was designed to have poured on top of it the second layer, containing fine aggregate, and to be one and one-half inches thick. These two slabs or layers will hereafter be referred to as "base slab" and "fill slab." The fill slab is designated "fill or mortar setting bed" in the specifications, and was to receive a vinyl tile finish floor covering. The defect giving rise to this litigation occurred between the two slabs of concrete.

The base slab was first poured by the Contractor and about 18 months later the fill slab was poured. After both slabs were poured, the fill slab started cracking and separating from the base slab and it was found that the fill slab had not bonded with, or adhered to, the base slab, and it became necessary to remove and replace the fill slab. An intensive investigation was conducted to determine the cause of the difficulty, which included reports by several testing laboratories employed by various parties.

Finally, in August of 1962, the Architects gave specific written instructions to the Contractor describing the manner of removal and replacement of the fill slab in the affected area. The Contractor replied in October of 1962, that a record of all labor, material and

equipment costs was being kept on a time and material basis and as the original base slab and fill slab were installed in a workmanlike manner, this constituted a change in the work and requested a written change order under the contract. The Architects responded in November 1962, that in light of the laboratory testing reports, they felt the obligation of replacing the fill was on the Contractor and refused to issue a change order, requesting that the Contractor proceed under Article 19 of the contract whereby the Contractor must replace all work condemned as not in conformance with the contract, and that if this was not proceeded with immediately, an appeal would be made to the Contractor's bonding company.

The Contractor proceeded with replacement of the fill without further correspondence until August 1965, at which time he requested and was refused payment for the work by the Architects.

Since the litigation involved the pouring and finishing of the two slabs, the specifications pertaining to them are fully set out as follows:

"Interior Slabs to Receive Fill or Mortar Setting Bed shall be finished by tamping the concrete with special tools to force the coarse aggregate away from the surface, and screeding with straight edges to bring the surface to the required finish plane.

"Interior Slabs—that are to receive a finish floor covering (this does not include ceramic tile covering) shall be finished by tamping the concrete with special tools to force the coarse aggregate away from the surface, then screeding and floating with straight edges to bring the surface to the required finish level. While the concrete is still green but sufficiently hardened to bear a man's weight without deep imprint, it shall be wood floated to a true and even plane with no coarse aggregate visible.

Sufficient pressure shall be used on the wood floats to bring moisture to the surface. After the surface moisture has disappeared, surfaces shall be steel-trowelled to a smooth, even impervious finish, free from trowel marks. After the cement has set enough to ring the trowel the surface of all slabs shall be given a second steel trowelling to a burnished finish. Where fill is applied and will receive a floor covering (not ceramic tile) fill shall be finished smooth in like manner.''

On January 14, 1966, the Contractor requested arbitration of its right to compensation under the contract, and the Library Board denied the request. The Contractor then brought suit against the directors for the additional cost of labor and materials in taking up and replacing the fill slab and the Architects were made third parties defendant.

Appellants argue that the plans and specifications called for a bonding of the two slabs by implication, and that the failure to secure a bond was the result of improper workmanship and failure of the Contractor to follow the plans and specifications. Appellee contends that the plans and specifications do not call for a bond and that the plans and specifications were followed explicitly in a good workmanship manner. All the parties seem to recognize that the trouble arose from the failure of the two slabs of concrete to bond with each other; that this resulted in the cracking of the fill slab and that it was necessary to remove and replace the fill slab. The Architects contended that the Contractor was negligent in pouring, curing, and finishing the concrete, and the Contractor contended that he poured, cured, and finished the concrete according to the plans and specifications prepared by the Architects and under the visual observation of the Architects. It was the Contractor's contention that the fault lay in the plans and specifications prepared by the Architects and in the di-

rect instructions of the Architects during the course of construction.

A jury trial resulted in a judgment in favor of the Contractor against the Trustees for $50,201.50 with judgment over in favor of the Trustees against the architects for the same amount.

The Architects and the Trustees are joint appellants here and they rely on the following points for reversal:

"Under the terms of the contract, the contractor cannot recover against the owner.

There is no competent evidence that the plans and specifications were deficient in any manner.

The undisputed evidence shows that the original work was not performed by the contractor in accordance with the plans and specifications.

The contractor is estopped to claim compensation and has waived any claim.

The Court erred in refusing to declare a mistrial when insurance was improperly brought to the attention of the jury.

The Court erred in admitting certain exhibits and testimony concerning change orders."

As to point one, it is not disputed that the contract provides for changes in the work to be approved in writing prior to their execution. Appellee admits that this provision was not complied with, but argues that strict compliance with this provision was waived by appellants through course of conduct. As to this course of conduct, appellee produced exhibits and testimony tending to prove that on many occasions the Architects gave oral directions to the appellee to do certain work and after

the work had been completed, the Architects would have the Library Board to pay for it. Appellants disputed this evidence as not being relevant to *remedial* work and that in this instance, the Architects specifically stated, prior to the execution of the work, that a change order would not be issued and thereby did not waive, but refused to waive, the written order. In addition to the exhibits and testimony pertaining to waiver, the appellee contends that it proceeded with the work in good faith, relying on the provision in the contract for arbitration of any of the Architects' decisions.

Thus, a fact question was properly submitted to the jury on this issue and there was substantial evidence from which the jury could have found in favor of the Contractor, especially in light of the desire for completion of this public building as speedily as possible and within the time limit of the contract, and the threat by the Architects of proceeding against appellee's bonding company for delay. This court has upheld waiver in similar circumstances in *Rivercliff Co., Inc.* v. *Linebarger*, 223 Ark. 105, 264 S. W. 2d 842, when it was stated:

> "For a second ground, appellant contends that the Master and the trial court should not have made any allowance to the Contractor because the extra work was not authorized in accordance with the terms of the contract. This contention appears to be supported by the terms of the contract, which provides that extras must be approved in writing prior to execution. This provision was not complied with but it does not constitute a defense available to appellant, because, as we hold, a strict compliance with this provision of the contract was waived by appellant in this instance. It is not disputed that the extra excavation was done with the knowledge and at the direction of Smith who was not only the architect supervising the work for Rivercliff but was also a part owner of the appellant corporation.

From his testimony we gather that he refused to approve an allowance for extras mainly because he did not think the Contractor was entitled to anything as a result of the changed method of constructing the foundation. It appears that other changes in construction had been made and paid for where no written change order had been previously issued. Although it was shown that several such changes had been made and paid for during the construction of the four buildings, yet Mr. Smith testified that only one written change order had been made."

Appellants' second and third points involve the same problems and will be discussed together. In total effect, their contention is that there is no evidence that the plans and specifications were deficient, but that the evidence shows that they were not followed by the appellee.

The opinion reports from laboratory testing experts were offered in evidence by stipulation. Master Builders reported:

"* * * Any excess water in the concrete exhibited itself as bleeding water since relatively little of it was absorbed by the forms or, lost through it. This caused segregation to occur which in turn resulted in the accumulation of a highly carbonated cement paste layer on the top surface. Insufficient curing also helped in detrimental carbonation of the top layer in the base concrete.

Secondly, *the surface of the base concrete was not scarified enough to expose good concrete and individual grains of aggregate and cement.* * * *

The placement of a lightweight topping over a hardened base concrete is difficult at best since shrinkage stresses in the topping may cause trouble.

In replacing the topping, the base slab will have to be physically scarified to sound concrete." (Emphasis supplied.)

Masters Builders concluded:

"* * * Disruption of the bond between the base slab and the topping resulted from differential shrinkage of the two concretes, the topping being subject to the greater shrinkage subsequent to completion of the floor. * * * [T]he concrete of the base slab was not adequately cured or protected from drying so that a layer of weak, porous mortar exists in the upper 1/8 to 1/4 inch of the base slab."

Oklahoma Testing Laboratory found and concluded:

"* * * A white material was noted on the bottom of the two separate sections of lightweight concrete but none was noted on the interfaces of the sections of the cores. * * * An analysis was made of the white material. From this analysis it was apparently cement. * * * According to our understanding a period of eighteen months elapsed between these pours. According to our examination of the samples it would be our opinion that the lack of bond was due to one or a combination of the following:

1. Lack of proper surface preparation. An examination of the interfaces of the cores, and of the slabs submitted, shows the concrete to have been fairly smooth. On concrete of this age, to insure good bond, we believe the floor should have been roughened by some method."

St. Louis Testing Laboratories reported:

"* * * The unsound material at the top of the base concrete is, in our opinion, a major factor for the

lack of bond between the base concrete and the lightweight concrete on the 1st and 2nd floors.

The cause for the unsound material at the top of the base concrete may be attributed to three factors or a combination of these three factors—excessive water at top surface, excessive vibration, and improper curing.''

After a study of these reports, the appellant Architects advised appellee as follows:

''It is this office's understanding, after a careful reading of these reports, that the major factor involved in the failure of the topping to bond with the base slab was the presence of a layer of unsound material in the top of the base slab. The laboratories recommended that this unsound material be removed by scarifying the base slab with a Tennant machine; cleaning the base slab carefully; saturating the base slab; brooming in a grout coat immediately ahead of placement of topping. * * * You are hereby instructed to proceed with the installation of the lightweight concrete topping throughout the building in accordance with the following procedure:

1. Remove all remaining original topping from the base slab in all areas and rooms. (Test panel on 1st floor to remain.)

2. *Remove all laitance and the weak, unsound surface portion of the base slab by scarifying with Tennant machine so as to expose sound mortar and coarse aggregate.* Areas of slab adjacent to walls and columns not scarified by machine shall · be scarified by hand.'' (Emphasis supplied).

Appellants presented evidence that the appellee did not follow the plans and specifications as designed, and

that, according to custom and practice, a bond is called for between sections of concrete in situations such as this, unless it is provided in the contract that a bond is not desired and positive action to prevent a bond is provided in the contract. On the other hand, appellee presented evidence that the work was done in accordance with the plans and specifications and in a good workmanlike manner; that the Architects' representatives were present and inspected the work without complaint; and that the contract specifically called for a bond at construction joints (not a part of the concrete slab or topping in question), but did not call for a bond between the base slab and the fill, or provide for a bonding agent between the two. Appellee presented evidence pointing out that the Architects' plans and specifications specifically called for the coarse aggregate in the base slab to be tamped away from the surface, leaving a layer of laitance in the surface of the base slab, which together with the slurry coat of cement ordered by the Architects' representative, constituted the weak white substance found by the testing laboratories and that this was the cause of the trouble. Suffice it to say, there was ample evidence presented on both sides to present a jury question on the points here involved, and there was substantial evidence from which the jury could have decided in favor of appellee on these points as they did.

Appellants' point four contends that when the Contractor was directed to proceed with the work at its own expense and the work was done without protest, then the Contractor is estopped from later claiming compensation, but it is noted that appellants did not plead estoppel in its answer. This court has held that estoppel must generally be pleaded to be available as a defense to a claim. In the case of *Jewell* v. *General Air Conditioning Corp.*, 226 Ark. 304, 289 S. W. 2d 881, it was stated:

"Since neither laches nor estoppel was pleaded as a defense below, the court was not afforded an op-

portunity to pass on such issues and the attempt to raise them for the first time on appeal comes too late. *Gerard B. Lambert Co.* v. *Rogers,* 161 Ark. 307, 255 S. W. 1089; *Bell* v. *Lackie,* 210 Ark. 1003, 198 S. W. 2d 725; *Steele* v. *Steele,* 214 Ark. 500, 216 S. W. 2d 875.''

Notwithstanding appellants' failure to plead estoppel, when the appellee advised that a record would be kept of the additional costs and requested the change order, the appellants were put on notice that appellee expected pay. When the Architects refused to issue the change order, stating that the obligation to replace the fill was on the Contractor, a standoff was presented as to who was responsible, and we are of the opinion that the appellee was justified in proceeding with the work, not as a waiver of his rights to dispute the Architects' decision, but in reliance on the contract provisions calling for arbitration of any decision by the Architects, as testified to by Mr. Carty. Appellants contend, however, that the appellee did not make his request for arbitration until three years after the Architects' decision not to issue a change order, and thus not within a reasonable time as required by the contract. The contract provisions as to notice of arbitration states:

''The demand for arbitration shall be made within a reasonable time after the dispute has arisen; in no case, however, shall the demand be made later than the time of final payment. . .''

It is not disputed here that the demand for arbitration came prior to the final payment. Appellee testified that the delay was due to ascertaining the cost of doing the work, but in any event, the reasonableness of the delay was a question for the jury. It is noted, however, that arbitration was rejected by appellants without prejudice to appellee's rights to litigate his claims for additional compensation. We are of the opinion that the

evidence does not support appellants' contention that appellee waived its rights to compensation.

Under point five, appellants contend that the trial court erred in refusing to declare a mistrial after the attorney for appellee asked the jurors, on voir dire examination, whether they held stock· in, or had any interest in, a liability insurance company. We have held that it is reversible error to .unnecessarily bring to the attention of a jury that insurance' is involved and that the issue in questioning, on voir dire, as to interests in insurance companies is one of good faith by the attorney questioning the prospective juror. See *DeLong* v. *Green,* 229 Ark. 100, 313 S. W. 2d 370; *Dedmon* v. *Thalheimer,* 226 Ark. 402, 290 S. W. 2d 16. In the case at bar, the question was a general one and was not pursued after a negative reply. There were insurance clauses in the contract that would have supported good faith in believing that insurance was involved, and the jury was affirmatively advised that no insurance was involved. Under these circumstances, we agree with the trial court that there was no prejudice involved, and we find no prejudicial error on the part of the trial court in refusing to declare a mistrial.

Under appellants' sixth point, they contend that the trial court erred in allowing exhibits and testimony to be admitted to show a course of conduct whereby appellants had waived strict compliance with contract provisions calling for a written change order prior to execution of the work, and on several occasions had verbally authorized changes without written order and later had paid for the work. Appellants contend that this evidence was not relevant to *remedial* work and did not involve situations where the Architects had specifically refused to issue a change order prior to the work being done. The Architects demanded that the appellee scarify the base slab and replace the fill slab. The appellee requested a change order which was refused. The Architects threatened appellee on its bond and we think that

the appellee made it plain that it would demand pay when it proceeded with the work. We are of the opinion that the change order requirement of the contract did not go to *liability* for the costs of the remedial work in this case. There was no dispute as to the amount, necessity, or nature of the work to be done in this case. The question was whether the appellee was liable for redoing work it should have done right in the first place, or whether the Architects had made the error and were liable for the additional costs. The Architects refused to indicate an acceptance of liability by making the change order, and although appellee did the work without the change order, it did so with the appellants under no misapprehensions that demand would be made for the cost of the work and without prejudice to appellee's right to sue for that amount. We conclude that if error was committed by the admission of the evidence pertaining to prior waiver of written change orders, such error was harmless to the appellants in this case.

To summarize—This entire case simply boils down to pouring a heavy aggregate concrete slab base for a floor in metal forms designed by the Architects under specifications requiring that this base be finished by tamping the concrete with special tools to force the coarse aggregate away from the surface, and screeding with straight edges to bring the surface to the required finish plane. When the coarse aggregate was forced away from the surface, a layer of laitance, referred to by some of the witnesses as "soup," but actually water, cement and fine sand, was drawn to the surface and after screeding, either with a bull float or some other straight edge, this base slab, laitance and all, was seasoned in use (as apparently planned) for an approximate period of 18 months. When all the parties were ready to install the fill slab, the hardened laitance was not removed and the surface of the base slab was not scarified to the aggregate or sound concrete. The base slab was swept and mopped, wetted down and applied with a slurry coat of cement and water, under orders

and directions of a representative of the Architects, and then a 1½ inch slab of light aggregate concrete was poured on top of the base slab and it failed to bond with the base slab.

The evidence is undisputed that it was necessary to remove the hardened laitance from the surface of the base slab and to expose the sound concrete, by scarifying the surface of the slab, in order to pour the fill slab in such manner as to obtain a satisfactory floor in compliance with the contract. It is obvious to us that a jury question was presented by all the evidence in this case and the jury apparently found that the fault lay in the Architects' plans and specifications. We conclude that there was substantial evidence to support the jury's verdict and that the judgment must be affirmed.

Affirmed.

FOGLEMAN and BROWN, JJ., dissent.

JOHN A. FOGLEMAN, Justice, dissenting. I would reverse the judgment of the lower court. The major basis for my disagreement with the majority is the belated application of the contractor for arbitration. The difficulty giving rise to this cause of action became known to all in December 1961. After considerable investigation of the cause of the problem, the architect, by letter of August 14, 1962, gave specific written instructions as to procedure with reference to the defect discovered. No reply by the contractor was made to the architect until October 12, 1962. The contractor's letter of that date advised that the work directed in the architect's letter had been undertaken and a considerable part of the required removal completed. This was the first advice that the contractor considered the instructions of August 14, 1962, to constitute a change in the work in accordance with Article 16 of the General Conditions of the Contract. There was a specific demand for a change order, and the contractor advised that it was keeping a record

of all labor, material and equipment cost incurred. On November 12, 1962, the architect advised that it was his opinion that the work was the obligation of the contractor and refused in unequivocal terms to issue a change order. This letter contained the following paragraphs:

> "This matter must be immediately resolved. On several occasions, we have been advised verbally as to dates when the building would be turned over for occupancy, and this information has been passed on to the owner. It is not now possible to meet these dates. In the meantime, the city is deprived of the use of the New Library which should have been completed months ago.

> We are asking you to proceed immediately with the replacement of the topping under those parts of Article 19 of the General Conditions of the Contract as they apply. If this is not done immediately, we must advise the Owner to act under Article 21 of the General Conditions of the Contract and appeal to your Bonding Company."

Nothing further was said or done about this decision of the architect until sometime in August 1965 when the contractor advised the architect that its costs in carrying out the architect's instructions of August 14, 1962, amounted to $49,702.45 and again demanded a change order. This demand was refused by the architect in a letter dated December 27, 1965, in which reference was made to the architect's decision set out in the letter of November 12, 1962. The contractor communicated with the owner about this demand for the first time by letter of January 14, 1966, in which a demand for arbitration was made. There is no evidence that the contractor's contentions were ever made known to the owner prior to this time. The contractor stated that it did not send copies of its letters to the architect to the library board. The owner, through its attorney, A. F. House, re-

jected the demand for arbitration in a letter dated January 31, 1966. The letter contained this paragraph:

"The Library rejects your demand for arbitration with respect to each and all of the items set forth in your letter of January 14th. Article 40 of the General Conditions provides that 'The demand for arbitration shall be made within a reasonable time after the dispute has arisen.' On November 12, 1962, the architects notified you that no change order would be issued, and, in their opinion, 'the removal and replacement of the topping is the obligation of the contractor.' A delay of more than three years in asserting the claim set forth in paragraphs 1 and 3 of your letter is patently unreasonable. Furthermore, witnesses who were familiar with the inadequacy of your work have moved away, and one has died, and as the Library was not given notice that you intended to contest the ruling of the architects with reference to the items set forth in paragraphs 1 and 3, it has exhausted the funds allotted to it for constructing a new building."

To me, the conclusion that the contractor accepted the decision of the architect is so inescapable that reasonable minds could not come to any other conclusion. I consider that appellee did not conform to the requirements of its contract. I further consider that it waived any right to arbitration that it might otherwise have had. These points were raised in appellants' Point IV. This point related to both estoppel and waiver.

In considering these matters, it is necessary that the applicable terms of the contract be reviewed. They are:

## GENERAL CONDITIONS

Article 12 (in part): "He [the Contractor] shall make good any such damage, injury or loss, except such as may be directly due to errors in the Contract

Documents or caused by agents or employees of the Owner, or due to causes beyond the Contractor's control and not to his fault or negligence.''

Article 15 (in part): "In giving instructions, the Architect shall have authority to make minor changes in the work, not involving extra cost, and not inconsistent with the purposes of the building, but otherwise, except in an emergency endangering life or property, no extra work or change shall be made, unless in pursuance of a written order from the Owner signed or countersigned by the Architect, or a written order from the Architect stating that the Owner has authorized the extra work or change, and no claim for an addition to the contract sum shall be valid unless so ordered. ¶The value of any such extra work or change shall be determined in one or more of the following ways: * * * (c) By cost and percentage or by cost and a fixed fee. ¶ If none of the above methods is agreed upon, the Contractor, provided he receives an order as above, shall proceed with the work. In such case and also under case (c), he shall keep and present in such form as the Architect may direct, a correct amount of the cost, together with vouchers. In any case, the Architect shall certify to the amount, including reasonable allowance for overhead and profit, due to the Contractor. Pending final determination of value, payments on account of changes shall be made on the Architect's certificate.''

Article 16: "If the Contractor claims that any instructions by drawings or otherwise involve extra cost under this contract, he shall give the Architect written notice thereof within a reasonable time after the receipt of such instructions, and in any event before proceeding to execute the work, except in emergency endangering life or property, and the procedure shall then be as provided for changes in the work. No such claim shall be valid unless so made.''

Article 19 (in part): "The Contractor shall promptly remove from the premises all work condemned by the Architect as failing to conform to the Contract, whether incorporated or not, and the Contractor shall promptly replace and re-execute his own work in accordance with the Contract and without expense to the Owner * * *. ¶ If the Contractor does not remove such condemned work within a reasonable time, fixed by written notice, the Owner may remove it and may store the material at the expense of the Contractor."

Article 31: "DAMAGES—Should either party to this Contract suffer damages because of any wrongful act or neglect of the other party or of anyone employed by him, claim shall be made in writing to the party liable within a reasonable time of the first observance of such damage and not later than the final payment, except as expressly stipulated otherwise in the case of faulty work or materials, and shall be adjusted by agreement or arbitration."

Article 38: "The Architect shall have general supervision and direction of the work. He is the agent of the Owner only to the extent provided in the Contract Documents and when in special instances he is authorized by the Owner so to act, and in such instances. he shall, upon request, show the Contractor written authority. He has authority to stop the work whenever such stoppage may be necessary to insure the proper execution of the contract. As the Architect is, in the first instance, the interpreter of the conditions of the Contract and the judge of its performance, he shall side neither with the Owner nor the Contractor, but shall use his powers under the Contract to enforce its faithful performance by both. ¶ In case of the termination of the employment of the Architect, the Owner shall appoint a capable and reputable Architect against whom the Contractor makes no reasonable objection, whose

status under the contract shall be that of the former Architect; any dispute in connection with such appointment shall be subject to arbitration.''

Article 39 (in part): ''The Architect shall, within a reasonable time, make decisions on all claims of the Owner or Contractor and on all other matters relating to the execution and progress of the work or the interpretation of the Contract Documents. ¶ The Architect's decisions, in matters relating to artistic effect, shall be final, if within the terms of the Contract Documents. ¶ Except as above or as otherwise expressly provided in the Contract Documents, all the Architect's decisions are subject to arbitration.''

Article 40: ''ARBITRATION—All disputes, claims or questions subject to arbitration under this contract shall be submitted to arbitration in accordance with the provisions, then obtaining, of the Standard Form of Arbitration Procedure of The American Institute of Architects, and this agreement shall be specifically enforceable under the prevailing arbitration law, and judgment upon the award rendered may be entered in the court of the forum, state or federal, having jurisdiction. It is mutually agreed that the decision of the arbitrators shall be a condition precedent to any right of legal action that either party may have against the other. ¶ The Contractor shall not cause a delay of the work during any arbitration proceedings, except by agreement with the Owner. ¶ Notice of the demand for arbitration of a dispute shall be filed in writing with the other party to the contract, and a copy filed with the Architect. The demand for arbitration shall be made within a reasonable time after the dispute has arisen; in no case, however, shall the demand be made later than the time of final payment, except as otherwise expressly stipulated in the contract. ¶The arbitrators, if they deem that the case re-

quires it, are authorized to award to the party whose contention is sustained, such sums as they or a majority of them shall deem proper to compensate him for the time and expense incident to the proceeding and, if the arbitration was demanded without reasonable cause, they may also award damages for delay. The arbitrators shall fix their own compensation, unless otherwise provided by agreement, and shall assess the costs and charges of the proceedings upon either or both parties."

The specifications provide: "Re-examination of questioned work may be ordered by the architect and if so ordered the work must be uncovered by the contractor. If such work be found in accordance with the contract documents, the owner shall pay the cost of re-examination and replacement. If such work be found not in accordance with the contract documents, the contractor shall pay such costs."

The contractor relies on Articles 15, 16 and 38 for recovery, but admits that the work was neither a minor change nor an emergency. It does contend that the architect is the agent of the owner under Article 38. Its only excuse for not making an earlier demand for arbitration is that it could not do so until the architect turned down its claim on December 27, 1965. Of course, this excuse should avail the contractor nothing because the architect had clearly made a decision rejecting this contention more than three years previously. Article 40 specifically provides for the continuation of the work during arbitration. The dispute to be determined originally was the decision that the contractor was at fault. The matter of cost, in case of a decision favorable to appellee, would have required a later decision by the architect under Article 15. This would not have been a matter for award under Article 40 incidental to the determination of the matter disputed.

Appellee admitted that it was directed by the archi-

tect on November 12, 1962, to proceed in accordance with Article 19 of the General Conditions of the Contract at its own expense, and that it did proceed until the job was finished. Appellee's president and only stockholder admitted that after receiving that letter, there was no doubt in his mind that it was the opinion of the architect that appellee was not entitled to payment for this work. He also admitted that there was not any doubt in his mind that the request for a change order had been rejected. He also admitted that there was no correspondence about this work between the contractor's letter of December 1962 and that of August 1965. Although he says that there were numerous conversations with the architect and his representative in the intervening period, he does not suggest that there was any indication of an alteration of position in any of these conversations. He states that the architect did tell him in a conversation prior to the letter of November 12, 1962, to keep track of this cost, but did not say that payment would be made. The director of the Little Rock Public Library, the person designated to approve change orders on behalf of appellants, had no idea that appellants were going to be asked to pay for this work prior to receipt of the demand of January 14, 1966.

Mr. William Allen, the partner of the architectural firm having this job under his direction, died on March 13, 1967, before the trial. Mr. Kellogg, the construction inspector for the architects, died on August 25, 1964.

I do not see how it can be said that the request for arbitration, a necessary prerequisite to this action, can be said to have been timely made. For nearly three years every act of the contractor was consistent with the idea that it conceded the correctness of the architect's decision, and inconsistent with any other thought.

The time limitation on a demand for arbitration was clearly stated. The decision of arbitrators was clearly a condition precedent to this action. It was to

be made within a reasonable time after the dispute had arisen. This court has defined, or approved, definitions of the phrase "reasonable time." In a case where the question was whether a notice to terminate a lease was given within a reasonable time, this court approved a definition declaring a reasonable time to be so much time as is necessary under the circumstances for a reasonably prudent and diligent man to do, conveniently, what the contract or duty requires should be done, having regard for the rights and possibility of loss, if any, to the other party to be affected. *Citizens Bank Building* v. *L. & E. Wertheimer, Inc.,* 126 Ark. 38, 189 S. W. 361, Ann. Cas. 1917E 520. In *Federal Land Bank of St. Louis* v. *Goodman,* 173 Ark. 489, 292 S. W. 659, we said:

"* * * It may be said that what is a reasonable time in any case depends on the circumstances of that particular case, and means such time as a prudent man would exercise or employ about his own affairs. It, of course, does not mean indulgence in unnecessary delay on the one hand, nor does it mean that he is to act without any regard to the circumstances and convenience of transacting business of that kind. It is whatever time is necessary to conveniently do what should be done in the particular case. It has been said that it means such length of time as may fairly, properly, and reasonably be allowed or required, having regard to the nature of the act or duty and to the attending circumstances."

A reasonable time is such a period as would suffice for the performance if the one whose duty it was to perform used such diligence, care and prudence as a person of ordinary diligence, care and prudence would use in the performance of a like duty under like circumstances. *Alphin* v. *Matthews,* 175 Ark. 1020, 1 S. W. 2d 79.

While the determination of what is a reasonable time under the circumstances is usually a question of

fact, it becomes a question of law when the facts are clearly established, undisputed or admitted. *First National Bank of Litchfield* v. *Pipe & Contractors' Supply Co.*, 273 F. 105 (CCA 2d 1921); *Colfax County* v. *Butler County*, 83 Neb. 803, 120 N. W. 444 (1909); *Rudolph Wurlitzer Co.* v. *Strand Enterprises*, 7 Ohio Op. 336, 32 N. E. 2d 62 (1936); *Goltra* v. *Penland*, 45 Ore. 254, 77 Pac. 129 (1904); *Hazelton* v. *First Nat'l Stores*, 88 N. H. 409, 190 Atl. 280 (1937); *Ridglea Interests, Inc.* v. *General Lumber Co.*, 343 S. W. 2d 490 (Tex. Civ. App. 1961). This is the case where the question is one of construction of a contract in writing. *Alford* v. *Creagh*, 7 Ala. App. 358, 62 So. 254 (1913). See, also, *Corneil* v. *Swisher County*, 78 S. W. 2d 1072 (Tex. Civ. App. 1935). In *Citizens Bank Building* v. *L. & E. Wortheimer, Inc., supra,* the court reached the conclusion that under the undisputed testimony the time was reasonable and the facts did not call for a submission of that issue to the jury.

Two years delay in bringing suit on a note not arising from the conduct of the adverse party was held to be more than a reasonable time. *Mehelm* v. *Barnet*, 1 N.J.L. (Coxe) 86 (1791). A delay of nearly one year by vendor in obtaining title from a supposed owner upon whom he had some claim for a conveyance was held to be unreasonable. *Saunders* v. *Curtis*, 75 Maine 493 (1883). Three years after notice that a claim on a contractor's bond was disputed was held not to be anything approximating a reasonable time for bringing of suit. *Hurst* v. *Dawson Bros. & Beaver*, 167 Tenn. 572, 72 S. W. 2d 767 (1934). Six weeks delay was held to be in violation of a rule requiring that a motion to set aside a judgment be made within a reasonable time but not later than six months after judgment. *Marquez* v. *Rapid Harvest Co.*, 1 Ariz. App. 138, 400 P. 2d 345 (1965). A delay of three years in moving to set aside a judgment was held to be unreasonable as a matter of law where a rule required the motion to be made within a reasonable time. *Osterhus* v. *King Construction Co.*, 259 Minn. 391, 107 N. W. 2d 526 (1961).

Under the circumstances existing here, I do not see how a conclusion that the time was reasonable could be reached.

Appellee's argument that the time limitation is the time of final payment is not well taken. The language on which it relies is that "in no case, however, shall the demand be made later than the time of final payment." It is quite clear that the expression of this ultimate limit did not in any way operate as a determination of what constituted a reasonable time or to extend the period for demand beyond a reasonable time. If this had been the intention, no reference would have been made to a demand being made within a reasonable time. The clause simply would have read: "The demand for arbitration shall be made not later than the time of final payment." There is nothing ambiguous about the clause in Article 40 and its meaning is clear. The reference to the limitation on demands as the time of final payment actually serves as a diminution of the period to what might be said to be a shorter time for disputes which arise near the conclusion of the performance of the contract.

Appellee also contends that appellants have effectively waived the condition precedent to appellee's right of action and the time limitation contained therein. Mr. House, the attorney for appellants, in a letter of February 22, 1967, stated that "acceptance of final payment [by the contractor] will not prejudice the rights of H. C. Enterprises, Inc. to litigate the claims for additional compensation." I cannot agree that this statement constitutes an express waiver of the arbitration clause by appellants. Mr. House, by his statement, certainly cannot be held to have voluntarily relinquished his client's right to stand upon the requirement of a decision by arbitrators prior to legal action by the contractor. Such is an absurd interpretation of his statement, if due and proper consideration be given the circumstances of the case. Appellants have denied liability throughout this

proceeding. To say that by the above statement appellants' counsel intended to thereby abandon a contractual defense to any possible right of recovery by appellee is preposterous. It seems inescapable to me that the only inference to be drawn from the statement is that the Library Board agreed not to contend that acceptance of final payment waived any breach by the Library Board, as it might have contended under the authority of such cases as *Truemper* v. *Thane Lbr. Co.,* 154 Ark. 524, 242 S. W. 823. The contractor needed to receive payment for the uncontested work which it had performed. By the letter of February 22, 1967, counsel for the appellants agreed to allow it that payment without prejudice to its right to sue, but retained all defenses due the Library Board under the contract. He simply agreed that the contractor would not be giving up any rights.

It is not clear whether appellee is contending that this defense by appellants was barred by failure to plead estoppel. If it is, the point is not well taken because the trustees of the Little Rock Public Library did plead waiver by alleging that appellee had a right to ask for arbitration in 1962 but failed to do so and never informed the Little Rock Public Library of its claim for extra compensation until January 1966.

The distinction between waiver and estoppel has been clearly made by this court in cases such as *Sovereign Camp W. O. W.* v. *Newsom,* 142 Ark. 132, 219 S. W. 759, 14 ALR 903. Estoppel arises only where one party has been innocently induced to change his position for the worse by the act of the other party. Not so, in case of waiver. It is simply the voluntary surrender of a known right. Waiver has been clearly defined in *Sirmon* v. *Roberts,* 209 Ark. 586, 191 S. W. 2d 824, quoting from 67 C. J. 290, 291:

"* * * the voluntary abandonment or surrender, by a capable person, of a right known by him to exist, with the intent that such right shall be surrendered

and such person forever deprived of its benefits; or such conduct as warrants an inference of the relinquishment of such right, or the intentional doing of an act inconsistent with claiming it. Thus, 'waiver' occurs where one in possession of a right, whether conferred by law or contract, with full knowledge of the material facts, does or forbears to do something, the doing of which or the failure or forbearance to do which is inconsistent with the right or his intention to rely upon it.''

I also feel that the trial court should have held as a matter of law that there was no waiver of the requirement for a change order as a basis for extra compensation. I do not agree that any course of conduct was shown which would have constituted a waiver under the circumstances existing here. In all of the previous instances there was no doubt that the work directed was "extra work." None of the previous instances required any removal of work already done by the contractor, except where this was admittedly done because of a specific change in design. None of the previous instances followed an extensive investigation to determine the cause of a defective condition. In none of the previous instances had a change order been specifically and unequivocally refused. In each of the previous instances a change order was issued before payment was made. Nowhere is there an indication by any conduct that the Little Rock Public Library Board intentionally and voluntarily surrendered the right to require a change order before payment for any work, much less the type and nature of work required in this instance. The fact that change orders were issued after the work had been done in some cases did not justify an assumption by the contractor that the requirement of a change order was waived, and it proceeded at its peril. See *Savignano* v. *Gloucester Housing Authority*, 344 Mass. 668, 183 N. E. 2d 862 (1962). Certainly appellee proceeded at its peril in the face of a refusal of a change order after request therefor. In no instance had the owner paid for extra

work where a change order had been refused. The contractor obviously did not think that the requirement of a change order had been waived, else he would not have requested one.

I feel that the trial court should have directed a verdict for appellants.

I am authorized to state that BROWN, J., joins in this dissent.